1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                    EASTERN DISTRICT OF OKLAHOMA

3
   UNITED STATES OF AMERICA,      )
4                                  )
                    Plaintiff,    )
5                                  )
   vs.                            )   Case No.  20-CR-00050-JFH
6                                  )
   JIMCY MCGIRT,                   )
7                                  )
                    Defendant.    )
8

9                    TRANSCRIPT OF PROCEEDINGS

10                        AUGUST 25, 2021

11           BEFORE THE HONORABLE JOHN F. HEIL, III

12                  UNITED STATES DISTRICT JUDGE

13                      SENTENCING HEARING

14

15

16

17   APPEARANCES:

18

19   FOR THE PLAINTIFF:        MS. SARAH MCAMIS
                               MS. COURTNEY R. JORDAN
20                             Office of United States Attorney
                               520 Denison Avenue
21                             Muskogee, Oklahoma  74401

22   FOR THE DEFENDANT:        MR. T. RICHARD O'CARROLL
                               O'Carroll & O'Carroll
23                             2171 North Vancouver
                               Tulsa, Oklahoma  74127
24
     REPORTED BY:              JOANNA SMITH, CSR-RPR
25                             United States Court Reporter

<u>PROCEEDINGS</u>

1

2    AUGUST 25, 2021:

3         DEPUTY COURT CLERK:  The Court calls Case

4    CR-20-50-JFH, United States of America versus Jimcy McGirt.

5    If counsel would please make your appearances for the

6    record.

7         MS. McAMIS:  Good afternoon.  The United States

8    appears by Sarah McAmis and Courtney Jordan.

9         THE COURT:  Good afternoon, counsel.

10         MR. O'CARROLL:  Your Honor, Richard O'Carroll for

11    Mr. McGirt.

12         THE COURT:  Good afternoon, Mr. O'Carroll.

13         MR. O'CARROLL:  Good afternoon, Judge.

14         THE COURT:  This matter comes on for sentencing.

15    Ms. McAmis, has the victim of this matter been

16    notified of this hearing and given an opportunity to attend,

17    if she desires?

18         MS. McAMIS:  Your Honor, the victim is here.  She

19    is present as well as her mother, and I believe wish to make

20    a statement to you at an appropriate time.

21         THE COURT:  This would be an appropriate time.

22    They may come forward, one at a time or together, if they

23    would like, and they may come forward and make their

24    statements up here.

25         You can come forward, ma'am.

 1          MS. McAMIS:  I believe the victim may have just
 2   stepped out in the hall.
 3          THE COURT:  Okay.  We can wait just a moment.
 4          MS. McAMIS:  Your Honor, just for the record, both
 5   of them wish to make a statement.  Do you want to wait until
 6   the victim comes back in?
 7          THE COURT:  Do you want to wait?
 8          MS. DeETTE KUSWANE:  Yeah.
 9          THE COURT:  Okay.  Yeah, we can wait just a
10   moment.
11          MS. McAMIS:  Thank you
12          MS. DeETTE KUSWANE:  She's right there.
13          THE COURT:  Okay.  And, Ms. McAmis, they can
14   either use the podium at the back or they can come up
15   forward, if they would like.
16          MS. McAMIS:  Your Honor, may she remove her mask
17   while she speaks to you?
18          THE COURT:  Yes.  Yes, she may.
19          MS. BRIEANNA COKER:  Hello.  My name is BrieAnna
20   Coker, and it's taken a lot out of me to be here today.  I
21   really don't even know where to start.
22          THE COURT:  Take your time.
23          MS. BRIEANNA COKER:  I mostly wanted to do this
24   for every one that he's hurt that doesn't have this chance
25   to stand up to him.  This happened at such a young age, and

1    I had to suppress all of that at a really young age, and I
2    didn't quite understand the trauma I endured.  And living
3    with that through my adult years, I didn't really understand
4    how that affected, you know, my self-worth, my confidence,
5    my relationships, until this came back to light.  And the
6    moment I saw his face again and heard his name and knew I
7    had to relive this whole thing, it put me in a really dark
8    place.
9        My whole life, I've been off and on antidepressants
10   and things like that, anxiety.  I didn't really know why
11   until just last year, I reached out and finally got help and
12   got counseling done and found out I had PTSD because of what
13   happened.  And I have been still on a healing journey today,
14   and I think that's why I'm here today because, usually, I
15   would let my anxiety and stuff hold me back, and I would let
16   people walk all over me, and I wouldn't stand up for myself.
17   But I'm done doing that, and I want other people to be brave
18   enough to stand up for themselves too, because people like
19   Jimcy McGirt deserve to be put away forever because what he
20   did to me and my brain and my development is going to live
21   with me forever, for the rest of my life.
22       Like, an example -- you know, I still live a normal
23   life right now.  You know, I work, I have my boyfriend and
24   stuff and friends.  And the other day at work I was having a
25   great day, and I was actually just complimented about how I

1    was doing a really good job because I just started there

2    recently, and I was having a good day, singing, making

3    everyone laugh, and then I heard the news about the

4    sentencing, and it threw me into a huge panic attack to

5    where my boss had to take me outside to help me breathe.

6    And it just -- it changes me completely.  The whole day just

7    -- it just really affects me.  And really, the only people

8    that would understand how I feel are victims and people who

9    have gone through the same thing as me.

10         And I find it really selfish of him to sit there and

11   pretty much make me go through this again as an adult.  And

12   it did affect me, you know, before it came back up, but not

13   as much as, you know, just last year.  It just -- I just

14   don't think it's fair at all.

15         I'm sorry my mind is just going everywhere.  I have so

16   much I want to say, but that's pretty much it.  I'm here for

17   the people that can't speak up for themselves against him.

18   So that's -- that's pretty much it.

19              THE COURT:  Ms. Coker, thank you for your

20   statement.

21              MS. DeETTE KUSWANE:  My name is DeEtte Kuswane.

22   I'm the mother of that hero that just stood up here and

23   spoke to you.

24         You know, a mother never wants anything to happen to

25   their child, especially somebody they trusted.  I wish I had

1   half the strength she had, but she shouldn't have to have

2   that kind of strength at five years old, having to testify,

3   and watching your child have to testify and say the things

4   that she had to say.  I don't live with the same thing that

5   she lives with because it happened to her, but I live with

6   the guilt that I wasn't able to keep from happening to her.

7        And the fact that he comes out like he's a hero.  He's

8   McGirt.  All you hear is McGirt, McGirt, McGirt.  He wants

9   to be free.  She's never going to be free.  She has -- he

10  served his time.  She has to serve it for the rest of her

11  life.  I don't even want to hear his name.  Nobody wants to

12  hear his name.  He doesn't deserve to have his name even

13  spoken.  It should be something like sovereignty or

14  whatever.  He's not a hero.  What he did, she's not the only

15  victim.  Why did my the daughter have to relive this?  For

16  what?  We're Native American too.  Over land?

17        He's destroyed other families, not just ours.  There's

18  so many people going through so much now because of him.  He

19  has caused so much turmoil, not just for my child and my

20  family, and he knows what he did.  He knows and his kids

21  know what he's done.  It has just not affected us.  He's

22  affected this whole state now.

23        My daughter is my biggest hero, and I didn't want her

24  to have to be another hero all over again.  I still remember

25  that time when she testified.  They told her she was a

1   guardian angel for all the other little kids.  She protected

2   every other little kid from him.

3         And I'll be honest, when this all came up, there was a

4   point she didn't want to come.  She didn't want to fight.

5   She didn't want to fight.  Why?  Because she didn't want to

6   face -- she didn't want to relive it, but she was having to

7   relive it because every day it was on the news.  She lives

8   here.  I live in New York.  I flew down and drove from Texas

9   just to make sure that I was here today with her and beside

10   her.

11         This shouldn't be happening.  People like him

12   shouldn't even get a second chance, because she doesn't.

13   She has to live with this for the rest of her life.  And

14   there is a victim that's dead, and he knows exactly who that

15   is.  They can't be here to speak her voice.  And I won't say

16   no names out of respect because her mother is in the

17   courtroom, but he knows what he's done in his own family.

18   And if this man walks free, he's going to do it again.

19         Like her, I have so much to say, but my child

20   shouldn't have to go through this, no child and none of the

21   other families having to relive this just because he found a

22   loophole.

23         Thank you.  That's all.

24           THE COURT:  Ms. Kuswane, thank you for your

25   statement.

1              MR. O'CARROLL:  Your Honor, for the record, we

2    object to the turmoil -- pardon me.  We object to the

3    turmoil, affected the whole state, and reference to a

4    deceased person who's supposedly a victim.  Ask it be

5    stricken.

6              THE COURT:  Your objection is noted for the

7    record.  The Court notes that a draft presentence

8    investigation report was filed on February 25th, 2021, with

9    a revised final presentence investigation report filed on

10   June the 10th, 2021, and then a second revised final

11   presentence investigation report was filed on July 26, 2021.

12       Mr. O'Carroll, did you have an opportunity to review

13   and discuss the second revised final presentence

14   investigation report, as well as the previous reports with

15   your client as well as with the probation office?

16             MR. O'CARROLL:  Yes, Your Honor, as to my client,

17   and, yes, as to the probation office.

18             THE COURT:  All right.  Ms. McAmis, did you have

19   an opportunity to review those reports and discuss them with

20   the probation office to the extent you wish to do so?

21             MS. MCAMIS:  Yes, Your Honor.

22             THE COURT:  The Court has reviewed the defendant's

23   objection to the presentence report filed at Docket Number

24   167 as well as the objections to the presentence report

25   filed today at Docket Number 179.  The Court has also

1    reviewed the government's response filed at Docket 168.

2         Mr. O'Carroll, would you like to be heard further

3    regarding defendant's objections to the presentence report?

4              MR. O'CARROLL:  Yes, Your Honor.

5              THE COURT:  You may proceed, sir.

6              MR. O'CARROLL:  Thank you.  May I?

7              THE COURT:  Yes, you may.

8              MR. O'CARROLL:  Thank you, Judge.  Your Honor, the

9    presentence report, in terms of the victim, I suggest was

10   overbroad, and there was a lack of sufficient cause to

11   justify the conclusions in the various paragraphs that were

12   listed in Mr. McGirt's objection.

13        Everybody has difficulties in their life, and what we

14   didn't have in terms of this hearing today where the issue,

15   the ultimate issue, is whether the government's application

16   for a variance will be granted, upward variance, is we

17   didn't have documentation, which I suggest is very important

18   in terms of impact of PTSD, etcetera, and some of the

19   assertions were directly contradicted.  The one that was --

20   I think that was the most notable was Ms. Norma Blackburn,

21   her testimony in 1996 in state court, where she said that

22   Ms. Coker, at that time obviously a very young child, was

23   having nightmares on a regular basis.  Not just nightmares,

24   fits, wake up wet, etcetera.  So there was turmoil going on,

25   and it was a year before these accusations.  So I think that

1   that's important.

2        Additionally, Judge, understanding that I'm

3   representing a man who's being sentenced today and trying --

4   trying to say it as softly as possible, there was a lot

5   of -- there was a lot of turmoil in the family as well that

6   was in the record.  Beyond just asking questions, which the

7   probation officer did, of Ms. Coker and her mother, there

8   was testing in the record, and there was a lot of -- and I

9   use the word dysfunction respectfully, because I think

10  everybody deals with dysfunction at some level -- in the

11  interactions and the interpersonal reactions with other

12  family members.

13       So there are other opportunities for the difficulties.

14  This is based on hearsay upon hearsay.  I mean, their

15  quoting of the -- of the aunt who has since deceased, and

16  there's been no testing of it, and it's quite redundant as

17  well, Judge.  I mean, it's not just like a little bit here

18  and a little bit there.  It's paragraph after paragraph

19  after paragraph.  And I think that is the engine that is

20  driving the government's motion, and I think that we should

21  look at it, as we should look at all things, with a critical

22  eye to whether or not it's actually causation in this

23  particular case.

24       Judge, I made a previous record on the position of

25  trust and responsibility.  I don't feel the need to argue

1  that -- that matter, Judge.

2          THE COURT:  All right.  Very well.  Thank you,

3  Mr. O'Carroll.

4          MR. O'CARROLL:  Thank you.

5          THE COURT:  Ms. McAmis, would you like to be heard

6  in response?

7      You may proceed.

8          MS. McAMIS:  Your Honor, your specific inquiry at

9  this time was with respect to objections to the PSR, and as

10 Your Honor correctly noted, the defense filed two different

11 objections.  The first being the objection to the two-level

12 enhancement for care, custody, and supervisory control.  And

13 as the government pointed out in it's response, the case

14 that the defense cited in favor of its objection is very

15 distinguishable from the case at bar.

16     The defense cited the *Blackbird* case for the

17 proposition that because in that case the victim was 15

18 years old, and the suspect was not -- or the defendant was

19 not living in the same home with her, the court had found

20 that the two-level enhancement was not applicable.

21         However, as Your Honor will recall from the testimony

22 that was elicited in front of this jury, the victim at the

23 time of these offenses against her was four years old, and

24 she was, in fact, staying in the care, custody, and

25 supervisory control of the defendant while her mother was on

1    vacation and while the grandmother was at work and away from

2    the home.  Therefore, as we noted in our objection to the --

3    or our response to the defendant's objection, the two-level

4    enhancement is applicable.

5           Your Honor, as to the objections to the PSR that the

6    defendant filed on today's date, well after not only the

7    first deadline, but the extended deadline that the Court had

8    previously given, I think it's unfortunate that the response

9    is to try in a publicly filed pleading to sully the victim's

10   family.

11          Of course, Your Honor heard the testimony during the

12   case and knows that some of counsel's assertions about the

13   nature and characteristics of the family are highly

14   contested and were directly disputed during the trial.  But

15   be that as it may, if the defendant's objection is based

16   upon a dysfunctional home, that in no way, shape, or form --

17   you can come from the best home in the world, you can come

18   from the most dysfunctional home in the world, but when you

19   are sexually abused, your vagina is penetrated at four years

20   old by your step grandfather, that has an everlasting and

21   lifetime effect on you despite the nature of your immediate

22   family.  And those are the objections that the government is

23   responding to at this time.

24          THE COURT:  Thank you, Ms. McAmis.

25       First, as to the custody, care, and supervisory

1    control matter, the defendant has filed an objection to the
2    guideline calculation contained within the presentence
3    report regarding the two-level enhancement applied pursuant
4    to U.S. Sentencing Guidelines, Section 2A3.1(b)(3)(A).  In
5    accordance with that provision, the offense level is
6    increased by two levels if the minor victim was in the
7    custody, care, or supervisory control of the defendant.  The
8    defendant contends that the minor victim in this case was
9    not left in his care, nor did he have any degree of
10   authority or responsibility for the minor.
11        As identified in the presentence report and addendum
12   and as the evidence at the trial in this case established,
13   the minor victim in this matter was four years old or
14   shortly before four years old, as she was turning four years
15   old the week that these incidents happened.  And for
16   approximately one week, near the child's fourth birthday,
17   her mother traveled out of the country for vacation and left
18   the child in the care of her grandmother, Norma McGirt,
19   Norma Blackburn, who was at that time married to and living
20   with the defendant.  It was during the time frame in which
21   the minor victim was in the care of the defendant and his
22   wife that the offense conduct in this matter took place.
23   Norma McGirt worked most days during that time frame, and
24   the defendant and the minor victim would take her to and
25   from work.  Ms. McGirt -- while Ms. McGirt was at work, the

1    minor victim was entrusted to the care of the defendant.

2    The offense conduct in this matter took place in the

3    defendant's home and in his vehicle, and most of which

4    occurred while Ms. McGirt was at work and the minor victim

5    was in the care of the defendant.

6         The evidence further adduced was that the minor victim

7    loved the defendant, always wanted to be with him, and loved

8    him like a grandfather, at least prior to the offensive

9    conduct.  There was also testimony previously that the

10   defendant [sic] had at times referred to the defendant as

11   grandpa.

12        The application notes of the U.S. Sentencing

13   Guidelines, Section 2A3.1, provide that the enhancement

14   under Subsection (b)(3)(A) is to be construed broadly and

15   includes offenses involving a minor victim entrusted to a

16   defendant, whether temporarily or permanently, and further

17   specifies that teachers, day care providers, babysitters, or

18   other temporary caretakers would be subject to such an

19   enhancement.

20        This case is easily distinguishable from the case of

21   the *United States v. Blackbird* at 949 F.3d 530, Tenth

22   Circuit, 2020.  Due to her young age, the minor victim in

23   this matter required adult care and supervision.  During the

24   time of the offense conduct, the minor victim was

25   temporarily entrusted to the care, custody, and supervisory

1    control of the defendant.  During the time the minor victim

2    was staying with her grandmother and the defendant, the

3    defendant was responsible for the minor victim's care during

4    the day while Norma McGirt was at work.  Based upon a

5    totality of the circumstances in this case, the Court finds

6    by a preponderance of the evidence that the two-level

7    adjustment under U.S. Sentencing Guideline, Section

8    2A3.1(b)(3)(A) is appropriate, and the guideline

9    calculations as to each count of conviction identified in

10   presentence report are accurate.  Accordingly, the

11   defendant's objection in this regard is overruled.

12        With respect to the objections filed today concerning

13   various sections in the presentence report, which go to the

14   nature of the impact that the offensive conduct had on the

15   victim, the Court notes that those seem to be consistent

16   with the testimony at trial.  The Court finds that the

17   explanation given and the firsthand observation of the

18   victim in this case by her mother and as how the sexual

19   abuse committed by the defendant against her impacted her

20   are appropriate.  The Court is mindful, though, that the

21   sentence in this case will not be based predominantly on

22   that impact regardless of how a child would respond to such

23   a sexual abuse, whether it be an impact that could affect

24   her for her whole life, or for 24 years, 28 years, or if the

25   child was able to easily move on, wouldn't explain or

1    justify the conduct.  So while the Court is overruling those

2    objections, the Court notes that that doesn't have very

3    significant impact.  While the Court understands and hears

4    the victim in this case and understands that she has been

5    substantially impacted, that factor alone does not play a

6    great part in what the Court's ultimate sentence will be.

7           Having addressed and overruled these objections, the

8    Court adopts the presentence report, and it will form the

9    factual basis for the Court's sentence today.

10          In calculating the defendant's sentence, the Court

11   must make an accurate determination of the applicable

12   sentencing range under the United States Sentencing

13   Guidelines.

14          The Court notes for the record that the 1995 edition

15   of the guidelines manual was in effect at the time of the

16   most recent conduct involved in the instant offense.

17   Therefore, the 1995 edition of the guidelines manual was

18   utilized to compute the guidelines in this case.

19          In this case, based upon the offense to which the

20   defendant was found -- offenses to which the defendant was

21   found guilty, the specific offense characteristics and an

22   adjustment for acceptance of responsibility, defendant's

23   total offense level is 36.  His criminal history category is

24   II.

25          Under the applicable guideline provisions, the

1    sentencing range for imprisonment is 210 to 262 months, the

2    sentencing range for supervised release is three to five

3    years, and the defendant is not eligible for probation.

4    Under the applicable guideline provisions, the Court may

5    also impose a fine from $20,000 to $200,000.  Restitution is

6    mandatory, but has not been ascertainable in this case.

7         After calculating the guidelines, I must consider the

8    relevant factors set out by Congress at Title 18, U.S.C.,

9    Section 3553(a), and ensure that I impose a sentence that is

10   sufficient, but not greater than necessary, to comply with

11   the purposes of sentencing.  These purposes include the need

12   for the sentence to reflect the seriousness of the crimes,

13   to promote respect for the law, and to provide just

14   punishment for the offense.  The sentence should deter

15   criminal conduct, protect the public from future crime by

16   the defendant, and promote rehabilitation.  In addition to

17   the guidelines and policy statements, I must consider the

18   nature and circumstances of the offense, the history and

19   characteristics of the defendant, the need to avoid

20   unwarranted sentence disparities among similarly situated

21   defendants, and the types of sentences available.

22        The government has filed a motion for upward

23   departure, or, in the alternative, an upward variance from

24   the guideline range at Docket Number 169.  The Court has

25   reviewed the government's motion.

1       Ms. McAmis, does the government wish to be heard

2  further concerning that motion?

3              MS. McAMIS:  Yes, Your Honor.

4              THE COURT:  You may proceed.

5              MS. McAMIS:  Thank you, Your Honor.  Today is a

6  very important sentencing hearing.  It is not important as

7  the defendant alleges because this case was the vehicle for

8  a change in Oklahoma's jurisdictional law.  That fact I

9  would state is not relevant to the Court's decision today

10  and should not be considered by the Court when assessing

11  punishment.  Instead, this case is about the actions of the

12  man behind the headlines, the lives of his victims and their

13  families that he has permanently affected, and what

14  punishment would best protect the public and bring justice

15  to the victim in this case and in his previous case.

16        The case that was presented to the jury in this

17  courtroom was the case about the man, Defendant McGirt, who

18  in 1996 used his role as a step grandfather to gain access

19  to and then sexually abuse a four-year-old little girl by

20  putting his fingers in a four-year-old's vagina, his tongue

21  in a four-year-old's vagina, and using a four-year-old's

22  little hands to touch his penis, all for his own sexual

23  pleasure.

24        But the story of this defendant, Mr. McGirt, and the

25  destruction caused by his continued sexual abuse of children

 1     started long before 1996.  In 1989, this defendant pled

 2     guilty to orally sodomizing two different boys on different

 3     and separate occasions.  One of those little boys was only

 4     five years old at the time, and the other was only eight

 5     years old at the time.  And the explanation that the

 6     defendant gave at the time for sexually abusing these two

 7     little boys is chilling.  It is the government's position

 8     that the defendant's statement is extremely important even

 9     today for this Court, when this Court is considering not

10     only the nature and characteristics of this particular

11     defendant, but also the defendant's risks of reoffending and

12     what is needed for the protection of the public.

13          In that case, in 1989, when confronted about what he

14     had done to these two little boys, the defendant denied and

15     denied and denied until he finally admitted and in response

16     claimed that he was not a habitual child molester, in his

17     words, and he said that the abuse of the boys would be his

18     first and his last, and that turned out to be far from the

19     truth.  The defendant's explanation of why he had to

20     sexually abuse a five-year-old little boy and an

21     eight-year-old little boy was because, in his words, his

22     girlfriend had just delivered a baby, and she was upset at

23     him for spending too much time with his ex-wife.  The

24     defendant said frustration over that particular situation

25     caused him to be driven to a perverted sexual desire, his

1    words.  The defendant said that his girlfriend was -- again,
2    all in his words -- uncomfortable during vaginal
3    intercourse, so she would only stimulate him orally.  The
4    defendant, again, in his words, claimed that his penis was
5    so large that his girlfriend's mouth got tired, and,
6    therefore, he was not able to ejaculate.  In the defendant's
7    word, he was so sexually frustrated by this that his sexual
8    frustration reached its peak in December during the exact
9    same time that these innocent children were present in the
10   apartment complex where the defendant was working.  It is
11   for those reasons that the defendant claimed he had to
12   sexually satisfy himself by orally sodomizing these two
13   little boys.
14         The defendant went to prison for that conduct, and he
15   was discharged in March of 1991.  And it is important to
16   note that within ten months, less than one year later, he
17   married his new wife, the victim's grandmother in this case,
18   and immediately had access to not only the four-year-old
19   victim in this case, but the other grandchildren involved.
20   This is a man who the Court should be able to recognize does
21   not seem to care whether his child victim is a boy or a
22   girl, apparently, as long as the victim is between four
23   years old and eight years old and can satisfy his own sexual
24   desires, he is happy.
25         As in the first case, when the defendant denied,

1   denied, denied, and then admitted what he had done, but

2   tried to blame it on, apparently, the actions of his

3   girlfriend and the size of his penis, in this case the

4   defendant denied, denied, denied what he had ever done, and

5   then finally wrote a letter apologizing for the sexual

6   abuse, but claiming that he was not in his right mind, and

7   that the devil made him do it.

8       So as Your Honor decides what sentence to impose

9   today, and in conjunction with the government's motion for

10  upward departure first and foremost, of course, Your Honor

11  knows that you can consider without limitation, any

12  information concerning the background, character, and

13  conduct of the defendant.  And part of an upward departure

14  motion is to consider whether this defendant's conduct is

15  within the heartland of this type of conduct, and whether or

16  not previous leniency upon him was ineffective.

17      This defendant has demonstrated that the leniency that

18  was shown on him at the time of his first conviction, he

19  only served a short amount of time for sexually abusing two

20  different children.  That was obviously an ill-effective

21  deterrent.  He could have taken that opportunity to

22  rehabilitate himself, stay away from children, and never

23  destroy another young life, but, instead, within a year, he

24  had done exactly what the probation officer in that first

25  case was afraid of.  And for that reason, the government

1    asserts that the Court can and should provide an upward

2    departure in this case.

3        In the alternative, as the government set forth in its

4    motion, the government requests an upward variance pursuant

5    to the sentencing factors in 18, U.S.C., Section 3553.  As

6    Your Honor is aware, those sentencing factors are divided

7    into subcategories, and the nature and the circumstances of

8    the defendant's crime, as in Subsection (a)(1), the

9    government would assert that his criminal conduct in this

10   case is extremely serious and demands an appropriately

11   serious sentence.

12        As I thought of how I would communicate to the Court

13   today the consequences, the lifetime consequences of sexual

14   abuse, I didn't know what the victim and her mother were

15   going to be able to stand up in front of you today and say,

16   and I would submit to the Court that there is no way I could

17   express it any better.  To be able to stand up and tell the

18   Court how this man has impacted their lives, not only in

19   front of this man, but in front of this entire courtroom of

20   strangers, both of them were extremely brave, and I commend

21   both of them for being able to do that.  There is no

22   question but that when this defendant chose three little

23   children to sexually abuse, he not only impacted their

24   lives, he impacted the lives of their families as well.

25   They are still living with it, and he should have to

1    continue to live with the consequences of his actions.

2         Under the -- also, under this category, Your Honor, it

3    is important that in the defendant's first conviction,

4    during those proceedings with the probation officer, the

5    probation officer noted that the defendant did not see

6    himself as a threat to the community.  It was noted that he

7    did not appear to feel any remorse toward his victims, and

8    that he did not express any concern about any present or

9    future impact on those boys.  In that case, the probation

10   officer found that the defendant had used his position of

11   employment and the vulnerability of young children to

12   perpetrate on the victim, and the probation officer informed

13   the court that the defendant, in fact, posed a threat to the

14   community.  This defendant proved everything about what that

15   probation officer predicted.  As soon as he got out of

16   prison, he gained the trust of yet another young child and

17   immediately sought her out and immediately continued to

18   sexually abuse her without any remorse or concern.  And to

19   this day, the lack of remorse and the apparent lack of

20   concern that he shows for his victim is stunning.

21        Although I know that the Court has stricken the

22   pleadings that this defendant continues to file in his own

23   handwriting, one only has to review one paragraph to

24   understand that he has no remorse whatsoever about his

25   actions.

1       Your Honor, the victim in this case told you about how

2   this has impacted her entire life, and she talked about the

3   fact that having this brought back up again has dramatically

4   impacted her as well.  And I would submit to the Court that

5   that is something that the Court can and should consider.

6   That having to relive everything that she has had to relive,

7   and having the defendant, even though he accepted

8   responsibility somewhat after his conviction in this case

9   and blamed it on the devil and blamed it on his mind, he

10  then chose to have -- take the opportunity to put her

11  through this entire process again.

12      It is important that Your Honor impose a significant

13  sentence for this defendant to -- under the need to afford

14  adequate deterrence to criminal conduct, this Court can and

15  should send a message to current and future abusers and

16  demonstrate to the public that sexual victimization of

17  children will be seriously addressed and will be deterred

18  when it is discovered, no matter how long it is into the

19  process.

20      And, finally, Your Honor, when -- under the category

21  -- in addition to what the government has set forth in its

22  motion, under the category of the need to avoid sentencing

23  disparities, Your Honor is correct that this Court should

24  consider and calculate the sentencing guidelines under the

25  1995 guidelines.  It is worth noting that the 1996

1    guidelines were imposed within a month after he committed
2    these crimes, but the 1995 guidelines were in effect at the
3    time.  And the government would submit to the Court that in
4    the 25 years since then, our society has reached a far
5    greater awareness of the lifelong impacts of child sexual
6    abuse.  If calculated under today's guidelines, the
7    defendant, first of all, would be facing a lifetime of
8    imprisonment because of his past conviction, but his base
9    offense level, even if you weren't considering that, would
10   be 11 levels higher.  Under the current guidelines, we
11   recognize that serious bodily injury is deemed to have
12   occurred under the crime of criminal sexual abuse, and in
13   addition the defendant would be eligible for an additional
14   five-level enhancement because of the pattern of activity
15   that he engaged in involving prohibited sexual conduct.
16        Your Honor, for all of these reasons -- Your Honor sat
17   through this trial, you heard all of the evidence, you heard
18   all of the evidence that the jurors in this case were not
19   able to hear, you know the background and history of this
20   case, and you know the impact of this case on the victim.
21   For all of the reasons that the government has articulated,
22   we ask the Court to depart and/or vary from the guidelines
23   and to sentence this defendant to a lifetime of
24   incarceration and not let him out into our community again.
25        Thank you, Your Honor.

1          THE COURT:  Thank you, Ms. McAmis.

2      Mr. O'Carroll, the defendant filed a response in

3  opposition to the government's motion at Docket Number 173.

4  Do you wish to be heard further concerning that response?

5          MR. O'CARROLL:  I do, Your Honor.

6          THE COURT:  And you may address the issue of

7  departure as well as the 3553(a) factors.

8          MR. O'CARROLL:  Thank you, Your Honor.

9      Your Honor, for the record, Mr. McGirt objects to the

10  notion by the government that he should be -- there should

11  be some kind of additional variation from the guidelines

12  because, quote, the victim had to relive this and was put

13  through the process.  The guidelines --

14          THE COURT:  Mr. O'Carroll, I don't want -- I don't

15  want to interrupt you, but I -- and I don't want you to be

16  cut short on time, but I want you to know that the fact that

17  this is a high publicity case, the fact that we had a

18  retrial because the Supreme Court determined that the State

19  didn't have jurisdiction, and the fact that Mr. McGirt took

20  advantage of his constitutional right to a jury trial, I can

21  assure you that those factors do not play any part in my

22  determination of what a sentence should be in this case.  I

23  didn't mean to interrupt you, but I wanted to let you know

24  that that is the case.  You may proceed.

25          MR. O'CARROLL:  Judge, and I believe that.  I felt

1    that I just needed to -- and I'll do it quicker, we object

2    to some of the notions by the government, specifically

3    relive, that's already factored in, and the not so subtle

4    request of ex post facto application.

5         Judge, now, if I can get on with the argument.  It's

6    been said that emotion is the enemy of reason, and the

7    government has a compelling argument.  It took me about four

8    hours to read this entire file, maybe less, maybe three, and

9    identified the biggest problem in this case.  It's always

10   been that way.  And this is the kind of case that in state

11   court, a public defender would refer to it as a ZIP code

12   case because there's five digits in the ZIP code.  And

13   that's exactly what the jury did.  It was about the previous

14   convictions.  And what -- the dynamic that occurs is he

15   doesn't testify, some jurors say the case isn't proven

16   beyond a reasonable doubt.  Second page is introduced, those

17   jurors who were holding out for acquittal now become leading

18   the charge to string the defendant up.  This is a well

19   recognized dynamic, Judge, and that's what happened in this

20   particular case.  So that's always been the issue, the

21   Oklahoma City events.  And the government did a good job of

22   laying that out, but then it went on to say that previous

23   leniency has been ineffective, and that's the argument, and

24   that's the nub of the matter.

25         And, Judge, you have to look at this in being in a

 1   unique situation.  Rarely have I ever been in a situation
 2   where my client has served the sentence and then went --
 3   before the sentence has been imposed.  I mean, that rarely
 4   happens.  And it's not 1996, and you're not speculating
 5   about his behavior.  Twenty-four years later, you have a
 6   record of his behavior.  And it was argued at the bail
 7   hearing that he had two write-ups in 24 years.  That's what
 8   we're talking about now.  The dynamic has changed.  So to
 9   say that previous leniency has been ineffective, maybe in
10   1996 it was ineffective, but 25 years later, 24 years later,
11   it's not been ineffective.  And Mr. McGirt isn't asking for
12   leniency, as the Court well knows, he's asking to stay in
13   the heartland of the guidelines.  And the government wants
14   to depart.  And the government not so subtly argues the
15   notion of upending jurisprudence and sending a message,
16   which, if said to a jury, is considered error.
17        So looking at the factors, all of the factors, Judge,
18   there's not a criminal history here to justify this.  If you
19   look at it, there's no information on a desertion, and
20   Mr. McGirt discharged the Marines with an honorable
21   discharge.  There's no information on a DUI whatsoever.
22   There's no information on an unauthorized use of a motor
23   vehicle, but Mr. McGirt was 16 at the time, and my memory --
24   and this is merely my memory, Judge, and I thought of this
25   just today -- is that this was a time -- there was a time in

1   the state of Oklahoma where boys were considered -- I mean,
2   women could buy beer at 18 and men could not buy beer at 18.
3   And finally the Supreme Court overruled that unequal
4   protection of the law.  But that unauthorized use was
5   expunged, vacated.  And I hear concepts, like,
6   technicalities.  They're not and the Court knows that.  So
7   in terms of the criminal history here, there is nothing
8   there to -- in terms of these charges, no underlying facts,
9   nothing to inform the Court whether he was really a juvenile
10   offense, whether the law was equally applied to him at the
11   time, and whether he even had a lawyer.
12           THE COURT:  Mr. O'Carroll, before you get too far
13   into that, with regard to the unauthorized use of a motor
14   vehicle, I note there it's noted that he had a conviction.
15   It's noted that it occurred in 1965, his age was 16 years
16   old.  That's in the record.  I can tell you I give
17   absolutely no weight whatsoever to that incident when he was
18   16 years old, when I think about what his sentence will be,
19   absolutely no weight whatsoever.
20           MR. O'CARROLL:  Is that the case for all of them
21   or just that particular one, Judge?
22           THE COURT:  Well, it's certainly for that, and
23   then there's others were there were no points given, not
24   enough information on the assault with a deadly weapon.  He
25   was 21.  I don't have enough facts on that.  He was given no

1  points on it.  That bears no weight in terms of what my

2  determination of the sentence would be.  The matter is not

3  the same obviously for the prior forcible oral sodomies, of

4  course.  He's got points for those, and that certainly is

5  very much weighing in my determination, as you might

6  imagine.  I'm sorry for interrupting you, but I wanted to at

7  least tell you where I was on that before you got too far

8  down the road.

9            MR. O'CARROLL:  Thank you, and I appreciate you

10  doing that, Judge.

11        So moving on to the 3553 factors and understanding

12  what we're dealing with, one of the factors, nature and

13  circumstances of the offense -- and I'm going to get in the

14  weeds on this, and it's going to be difficult, but I need to

15  do it.  This isn't some kind of extreme harm.  It was slight

16  touching.  Yes, it was touching.  Yes, I understand the

17  nature of the accusation.  But under the guidelines and when

18  you're -- when you're doing a departure, there has to be

19  something significant to warrant that.  So as -- and it's

20  already baked in, in the guidelines that this is an under 12

21  crime, and it's already baked in, in the guidelines that

22  this is an under 12 crime with a previous conviction.

23        Factor No. 2 under 3553, history and characteristics

24  of the defendant.  I anticipate the defendant will tell you

25  in allocution that he was abused, and I think that that's

1    not unusual.  I think that's quite usual as a matter of
2    fact, and I don't think there's any data out there to say
3    that it isn't a consideration.  And, yes, the government did
4    a good job about Mr. McGirt in Oklahoma City, giving
5    ridiculous notions about why he was doing this.  And if I
6    don't say anything else, Judge, I think the word that I need
7    to speak right now is the word "insight."  There's a
8    difference after 24 years in his mindset today than there
9    was in 1996, and most definitely was in 1988.  And it takes
10   that kind of insight to make this all understandable to
11   anybody and especially a person who's walking around that
12   doesn't understand it.  And he will explain that to you.
13        So the characteristics of the defendant today are not
14   what they were in 1996.  The characteristics of the
15   defendant today are based on the fact that he had to
16   struggle in prison to avoid abuse, and he wasn't successful.
17   And he was beaten to the extent that he was beaten, and his
18   probation officer was made aware of that.  I was sitting in
19   the room when he told her about it.  And the anxiety that
20   comes from that is terrifying.  The free-floating anxiety of
21   never knowing.  You get hit -- you get hit with a rock in
22   the head and you're knocked unconscious.  You wonder is it
23   going to happen again.  So your head's on a swivel forever.
24   Similarly, you get a broken collarbone because you've been
25   beaten.  You wonder is it going to happen again.  He got

 1   older.  Did things kind of settle down?  Yes.  But that's
 2   what we're talking about, his characteristics today, not in
 3   1996.
 4        Again, the need to reflect on the seriousness of the
 5   offense, promote respect for the law, and provide a just
 6   punishment.  Do not the guidelines do that?  I think they
 7   do.  So we're dealing with just a need to depart.  We're not
 8   asking for leniency.  We're suggesting that Mr. McGirt,
 9   today, is a different person than he was in 1996 and most
10   definitely 1988.
11        And will it afford adequate deterrence.  Let me talk
12   about that for a minute.  Counsel makes -- puts great weight
13   on the fact that the guidelines and the base offense rates
14   changed within a month of these events.  Okay.  They did.
15   But one of the criteria is uniformity.  You don't achieve
16   uniformity, I would suggest, by departing from the
17   guidelines.  You achieve uniformity by -- and making ex post
18   facto application of a new law.  You achieve uniformity by
19   not departing from the guidelines, and everybody is within
20   the same parameters.  And, Judge, I know that you know that.
21   I just felt obliged to say it.
22        The need to protect the public from further crimes
23   from the defendant, Number 5.  Again, Judge, it was -- at
24   the bail hearing, Mr. McGirt's family and his kin, even
25   there was a retired Lighthorse officer, we were trying to

1    get him out with a monitor, have him live in trailer in

2    Holdenville.  Probation didn't talk to the family.  We gave

3    them all the information, and that was a little troubling in

4    the sense that maybe they had new information that I didn't.

5    But he is 73 years old.  He's whipped.  You can look at him.

6    He's still a little bit feisty, and he'll file

7    jurisdictional motions and fire his lawyer, Judge, but he's

8    whipped.  And insight becomes very, very important,

9    especially when he can translate what happened to him into

10   why he's doing really abhorrent stuff.  So that's what we're

11   dealing with here.

12         And we talked about unwarranted sentencing

13   disparities.  The Court should look at that in terms of

14   departure upward versus not departure upward, that

15   consistency, as opposed to ex post facto.

16         And then the final factor is restitution, which the

17   Court has already said is not really much of a factor when

18   somebody has been in prison for 24 years.

19         Judge, those are the reasons -- and I started this by

20   saying emotion is the enemy of reason, and it is.  Good

21   lawyers definitely hit the right buttons, they provoke

22   emotions.  This room is full of emotions.  It should be.

23   It's natural.  But what we're really talking about here is

24   whether or not we need to deviate from the guidelines.  And

25   I do believe you, sir, when you say that this isn't about

 1 | politics.  You're an Article III judge.  But that's still in
 2 | the air.  It's not only in the air, it's now in this record,
 3 | and that is a factor.
 4 |     So the government is asking for too much.  And if the
 5 | totality of the circumstances, with all of these 3553, they
 6 | only get to one place, the previous leniency was
 7 | ineffective; therefore, there needs to be -- I forget the
 8 | phrase that the guidelines use -- additional punishment is
 9 | -- and that is not an accurate factual statement today,
10 | because we are in an unusual position where Mr. McGirt has
11 | served the sentence.  Society will be protected with a
12 | monitor.  Society will be protected with Mr. McGirt living
13 | five miles from pavement.  Society will be protected by his
14 | family being around him.  And what we're talking about here
15 | is anger and -- that's sufficient.
16 |     So we would suggest, respectfully, that the government
17 | hasn't proven the need for a departure, and we ask that the
18 | motion be denied, Your Honor.
19 |     THE COURT:  Thank you, Mr. O'Carroll.
20 |     The government has filed a motion for an upward
21 | departure or variance from the advisory guideline
22 | calculations identified in the presentence report in this
23 | case, asserting that the identified range does not reflect
24 | the nature and circumstances of the offense or the
25 | defendant's pattern of criminal conduct, and suggesting that

1    a sentence of life imprisonment is appropriate in this.

2         Counsel for the government identifies prior acts of

3    sexual abuse by the defendant against multiple minor

4    victims.  Counsel further identifies the entirety of the

5    defendant's prior criminal history and provides that his

6    criminal history category substantially underrepresents the

7    defendant's criminal history and likeliness of recidivism,

8    as some of his prior convictions were not assessed criminal

9    history points due to the age of the prior convictions.  The

10   government further asserts that the current statutory and

11   guideline provisions for the defendant's offense and

12   conviction result in a life sentence, and anything less than

13   that would be -- would result in sentence disparity.

14        The Court recognizes its authority to depart or vary

15   from the advisory guidelines.  The Court finds the advisory

16   guideline imprisonment range identified in this case is

17   appropriately determined based upon the United States

18   Sentencing Guidelines in effect at the time of the offense

19   conduct in this matter, and that a departure under the

20   guideline policy statements is not warranted.

21        That having been said, the Court looks at the case of

22   *Gall v. United States* and makes some observations.  Therein,

23   the Supreme Court has noted that a district court should

24   begin all sentencing proceedings by correctly calculating

25   the applicable guideline range.  The Court has done that in

1    this case.  As a matter of administration and to secure

2    nationwide consistency, the guidelines should be the

3    starting point and the initial benchmark.  The Court has

4    noted that.  The guidelines are not the only consideration,

5    however.  Accordingly, after giving both parties an

6    opportunity to argue for whatever sentence they deem

7    appropriate, the district judge should then consider all of

8    the 3553(a) factors to determine whether they support the

9    sentence requested by either party.  In doing so, the Court

10   may not presume that the guideline range is reasonable.  The

11   Court must make an individualized assessment based upon the

12   facts presented.  If the Court decides that an outside

13   guideline sentence is warranted, the Court must then

14   consider the extent of the deviation and ensure that the

15   justification is sufficiently compelling to support the

16   degree of the variance.

17        In establishing an appropriate sentence in this

18   matter, the Court has taken into consideration the totality

19   of the nature of the circumstances of the instant offense,

20   as well as the characteristics and the criminal history of

21   the defendant, to include his prior criminal history.  And

22   the Court has considered the combination of these 3553(a)

23   factors as well as the advisory nature of the applicable

24   guidelines.

25        The nature and circumstances of these offenses are

1   very serious.  Despite having been convicted of sexually

2   abusing two minor boys and being imprisoned for those

3   offenses, less than six years later, after the defendant's

4   release, the defendant repetitively victimized his wife's

5   four-year-old granddaughter, which is the basis for the

6   instant offenses in this matter.  The defendant did so by

7   digitally penetrating her vagina, sodomizing her, and having

8   the four-year-old touch his penis, all for his own sexual

9   gratification.  The victim viewed the defendant as a

10  grandfather figure.  Nevertheless, the defendant violated

11  the victim's trust and the victim's body and abused her over

12  a multiday period.  Defendant threatened the victim by

13  telling her that if she disclosed the abuse to her

14  grandmother, her grandmother would be mad at her and that

15  she would go -- and that he would go to jail.

16       The defendant has imparted unimaginable pain and

17  suffering on the victim.  Her family testified at the trial,

18  after the incident, she went from a happy, loving child to a

19  destructive, angry, and defiant child.  Over the years, the

20  victim has suffered from intense nightmares and self-harm.

21  The victim has had to seek counseling and cope with the

22  trauma of the event.  When she testified in this court 24

23  years later, as an adult, the pain, hurt, and trauma was

24  still very apparent to this Court.

25       The Court has specifically considered the defendant's

1    history and characteristics.  The defendant exhibits a
2    pattern of perpetrating sexual abuse against minor children.
3    In his first convictions for sexual offenses, the defendant
4    sexually abused two small boys, ages five and eight, on two
5    separate occasions.  The defendant bribed each of the boys
6    to allow him to sexually abuse them by paying them money.
7    He served approximately two years of his five-year sentence
8    of imprisonment imposed in that matter.  The defendant has
9    demonstrated a repetitive sexual predation of young
10   children.  His criminal sexual acts progressed from one-time
11   events with young boys, who were residents of an apartment
12   complex where he was employed in maintenance, to repeatedly
13   abusing his wife's young granddaughter who was temporarily
14   staying in the defendant's home and who was under his care.
15   The Court finds by a preponderance of the evidence that the
16   defendant is a child sexual predator with a high risk of
17   recidivism.
18          Further, as demonstrated by the presentence report and
19   the extensive information defendant requested to be included
20   in the report, defendant has a substantial concern for
21   himself and does not indicate any sense of remorse for his
22   actions or concern for any of his victims whatsoever.
23          In fashioning a sentence, the Court is to avoid
24   unwarranted sentence disparities among similarly situated
25   defendants.  Section 3553(a)(6) requires a district court to

1  consider disparities nationwide among defendants with
2  similar records and guideline calculations.  However,
3  disparate sentences are allowed where the disparity is
4  explicable by the facts on the record.  Here, the
5  defendant's guideline range does not reflect the severity of
6  the conduct or defendant's status as a repeat offender.
7  Since defendant's offense occurred in 1996, the sentencing
8  guidelines have been revised since that time.  Under the
9  current guidelines, defendant would receive a five-level
10  enhancement pursuant to U.S. Sentencing Guideline
11  4B1.5(b)(2) as a repeat and dangerous sex offender against
12  minor children, rendering his base offense level 41 with a
13  guideline range of imprisonment from 360 months to life.
14  Defendant is, in fact, a repeat, dangerous sex offender
15  against minor children.  The Court notes that after an
16  Oklahoma jury heard the facts and circumstances of this
17  case, it was compelled to render a verdict against the
18  defendant, which included two 500-year terms of imprisonment
19  and a term of life without parole.
20      The Court is mindful of the U.S. Supreme Court's
21  decision which held that the State did not have
22  jurisdiction.  Accordingly, the underlying jury verdict does
23  not bind this Court, and this Court is not looking to that
24  jury verdict to determine an appropriate sentence in this
25  case.  With that said, the jury's verdict is indicative of

1   the severity of the defendant's conduct and does shed some
2   light on the sentence disparity issue, at least as far as an
3   Oklahoma jury is concerned.

4         Finally, the Court has considered the types of
5   sentences available.  Based upon the characteristics of the
6   instant offenses and the defendant's history and
7   characteristics, the Court is convinced that there is not a
8   sentence within the guideline range that can be fashioned to
9   protect the public from this defendant.

10        While the sentencing guidelines provide for an
11  advisory guideline range of imprisonment of 210 to 262
12  months, the federal statutes provide for imprisonment of any
13  term of years up to life.

14        For the reasons articulated and to reflect the
15  seriousness of this offense, promote respect for the law,
16  provide just punish for the offense, and protect the public
17  from further crimes by this defendant by ensuring that no
18  child is victimized for the sexual gratification of this
19  defendant, the Court finds that an upward variance is
20  warranted in this case.  A sentence greater than the
21  imprisonment range identified by the advisory guideline
22  calculations is reasonable and sufficient, but not greater
23  than necessary, to comply with the sentencing objectives set
24  forth in Title 18, U.S.C., Section 3553(a).  An upward
25  variance in this matter will adequately reflect the

1    seriousness of the offense, provide just punishment, afford

2    deterrence to further criminal conduct, and protect the

3    public from further crimes by this defendant.  Therefore,

4    the government's motion is granted in part.

5         The Court further notes that the defendant is a

6    three-time convicted child abuser, and the Court must pose

7    the question:  At what point does the Court stand between

8    this defendant and any other child who might come in contact

9    with him were he to be released to the public?  At what

10   point, if not now.  This Court, in good conscience, cannot

11   subject another child to the defendant's predatory ways.

12        Will the defendant and his counsel please approach?

13        Mr. McGirt, do you wish to make a statement, sir?

14             THE DEFENDANT:  Yes.

15             MR. O'CARROLL:  May I have a moment?

16             THE COURT:  Yes, you certainly may.

17             THE DEFENDANT:  Your Honor --

18             THE COURT:  Mr. McGirt?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  You're welcome to take your mask down

21   if you would like, sir, but you certainly are welcome to

22   keep it up if you would like as well.

23             MR. O'CARROLL:  One moment, please, Judge.

24             THE COURT:  You may proceed, sir.

25             THE DEFENDANT:  First of all, I'd like to give

42

1 │ honor to the most high and give honor to this honorable
2 │ Court and to my family and those that have believed in my
3 │ innocence and those that have supported me.

4 │     And I had a two-page allocution prepared, and our
5 │ printer -- they had to buy at new printer at the prison, and
6 │ they couldn't get it to work, and they were supposed to fax
7 │ it to you.  But I, too -- I mean, I -- I -- I realize, you
8 │ know -- if I was guilty -- if I was guilty, all the things
9 │ that I've heard in this courtroom, I'd hate that man myself.
10 │ I would.  But as I've said time and time again, I mean, I've
11 │ not been able to tell the other side of the story.  I've
12 │ tried to the best I could, but I -- back in -- I know how to
13 │ plead guilty when I'm guilty.

14 │     Back in 1989, I waived my preliminary hearing, I
15 │ entered a blind plea and plead guilty to abusing those two
16 │ boys.  I did.  And I want on ahead and let that be my
17 │ lesson.  But like we've said in some of our pleadings, the
18 │ -- the -- what happened to me at ten years old left some
19 │ scars with me, and I suppressed them as -- in the Marine
20 │ Corps, especially in prison.  And when I went in 1965, I
21 │ suppressed -- I had the homosexual tendencies.  I mean --
22 │ and I suppressed them, I suppressed them, I suppressed them,
23 │ until 1988 when it came out, and I came face to face with
24 │ that dark side.

25 │     And like I say, I had all this stuff written down, and

1    I was -- I was beaten pretty bad back in 2003, and I had to
2    take -- they choked me unconscious with a towel after they
3    broke my collarbone, knocked me -- knocked me out.  When I
4    came to, they stomped all over me and everything and broken
5    my collar -- all this stuff is in the record.  It's -- it's
6    medical.  And -- and so I have problems with -- I took -- I
7    took medication for a number of -- from 2004 until 2009, and
8    that caused a lot of the constant confusion and loss of
9    recall and -- and -- and some other things, and that's why I
10   have problems with my memory, and that's documented too.
11   And I've been talking to the psych services over at -- and
12   like I -- and she said that -- the clinician says that the
13   -- the medication that I took was -- it changes the chemical
14   balance in our brains, and that's how it was able to get
15   over the PTSD, and she said that they -- that it did that to
16   some people, and it might be permanent, so -- but, anyway,
17   having said all that, I -- I know how to -- I know how to
18   plead guilty whenever I'm guilty about something.  And I --
19   I -- and what I've observed here in the courtroom, I mean,
20   the accuser and her family and stuff, I mean, I don't hold
21   anything against them.
22        And there was one question that that's always, always,
23   always troubled me, and that's how five people could be in a
24   house -- in a house at the same time -- not all five, but, I
25   mean -- and all that stuff is in some of the writings that I

1    put in, like, in my objection, objection to the report, and

2    -- and it's -- it's written down, but I -- I can't remember

3    some things.  My -- I mean, some things I can, and it takes

4    me days and days.  And like I say, I stayed up -- they let

5    me stay up last night until -- until about two o'clock this

6    morning typing that page, after I read the allocusal [sic]

7    with -- with Mr. O'Carroll.  After I read that, then I went

8    on ahead and went through, and I did a two-pager myself.

9    And my unit manager was going to try to get it printed and

10   fax it to your -- I mean, email it to you, but I don't know.

11   I guess it didn't happen.  But, anyway, I can't say

12   everything I had written down because it took me over half

13   the night to write it, but I accept -- I -- I know that I

14   was wrong in what I did to those boys.

15          And if I -- and by listening to all the testimony and

16   watching the demeanor of the accuser and her family, I mean,

17   if I had really done that, if I had really done, I'd hate

18   myself, but -- and there are things that really weren't

19   brought out in trial.  And I won't rehash the trial or

20   anything, but just like some of the misinformation that's

21   been in some of the reports or motions, like, where it said

22   that one thing was that -- that she'd sweated and her -- she

23   was wet, and her hair was wet, and they had to move her from

24   bedroom to bedroom.  All that stuff was going on before,

25   before the accusation.  It's in the transcript.  And another

1  thing that's in the transcripts, where she said that her --
2  her aunt had told her what to say, practiced with her, and
3  made that tape, it's in the transcripts, trial, preliminary
4  hearing.  It's in the transcripts.  And the doctor didn't
5  find no kind of -- no kind of scars, no tears, nothing.  I
6  mean, all that, I can't understand.

7       But like I say, if I was guilty, I know how to plead
8  guilty.  I waived my preliminary hearing.  I went on ahead
9  and -- and I was offered a five-year plea bargain to plead
10 guilty to this.  Norma was with me.  I was offered five
11 years, plea bargain, because they didn't have a case.  And I
12 was offered -- before trial, the other -- the other DA went
13 on ahead and offered me 20.  He said, you know -- and I told
14 them, I can't plead guilty to something I didn't do.  I know
15 how to plead guilty.  I had to write out a statement.  I
16 wrote it out.  And -- and -- and -- and like I keep saying,
17 five people were in that house.  Me and her uncle was out
18 there in the driveway detailing cars for those two days, and
19 I think I know what -- and then the -- for the other three
20 days, there were -- well, it's all written out.  It's all
21 written out.

22      And so that's -- I'd just like to -- so, once again,
23 like I said, I wanted to go ahead and thank the most high
24 for this opportunity and thank this honorable Court and
25 thank my family for their support, and those that -- once

1   the truth actually comes out, I mean, it will, but ...

2              THE COURT:  Thank you for your statement,

3   Mr. McGirt.

4        Mr. O'Carroll, do you have anything else to add on

5   behalf of your client, sir?

6              MR. O'CARROLL:  One moment, Judge.

7              THE COURT:  Yes.

8              MR. O'CARROLL:  Judge, he told me earlier -- may I?

9              THE COURT:  Yes, you may.  Yes.

10             MR. O'CARROLL:  If I could make some statements,

11  and he'll correct me.  He told me earlier that one of the

12  things he wanted to say was that, you know, and -- he

13  remembers the first trial well, and he remembers Ms. Coker's

14  mother nodding her head in the front row.  But he also told

15  me that he didn't doubt Ms. Coker's sincerity and didn't

16  begrudge Ms. Coker, that he understood the dynamic in play.

17       Is that correct, Mr. McGirt?

18             THE DEFENDANT:  (Nods head.)

19             THE COURT:  Have you remembered anything else that

20  you want to say to the Court?

21             THE DEFENDANT:  (Shakes head.)

22             MR. O'CARROLL:  Thank you, Judge.

23             THE COURT:  All right.  Thank you very much.  All

24  right.  You both can remain right there.

25             MR. O'CARROLL:  Here?

**United States District Court**
**Eastern District of Oklahoma**

1          THE COURT:  Yes.  Thank you very much.

2      Ms. McAmis, does the government wish to make a final

3  statement?

4          MS. McAMIS:  No, Your Honor.

5          THE COURT:  Mr. McGirt, you appear before the

6  Court today for the purposes of sentencing, having

7  previously been convicted of Count One of the superseding

8  indictment charging you with aggravated sexual abuse in

9  Indian Country in violation of Title 18, U.S.C., Sections

10  1151, 1153, 2241(c) and 2246(2)(C); Count Two of the

11  superseding indictment charging you with aggravated sexual

12  abuse in Indian Country in violation of Title 18, U.S.C.,

13  Sections 1151, 1153, 2241(c), and 2246(2)(B), and Count

14  Three of the superseding indictment charging you with

15  abusive sexual contact in Indian Country in violation of

16  Title 18, U.S.C., Sections 1151, 1153, 2241(c), 2244(a)(5),

17  and 2246(3).

18      In accordance with applicable law, it is the order and

19  judgment of this Court that you, Jimcy McGirt, are hereby

20  committed to the custody of the Bureau of Prisons to be

21  imprisoned for a term of life as to Count One, life as to

22  Count Two, and life as to Count Three, all to run

23  concurrently.

24      In the event that you are released from imprisonment,

25  you shall be placed on a term of supervised release for a

1    period of five years as to Counts One, Two, and Three.

2    Should the term of supervised release be revoked, an

3    additional term of imprisonment of five years could be

4    imposed at each revocation.

5         Immediately upon release from confinement, but in no

6    event later than 72 hours, you must report in person to the

7    probation office in the district where you are authorized to

8    reside.

9         In the event you are placed on supervised release,

10   while on supervised release, you must not commit another

11   federal, state, or local crime.  You must not own, possess,

12   or have access to a firearm, ammunition, destructive device,

13   or other dangerous weapon.  You must, at the direction of

14   the United States Probation Office, cooperate with and

15   submit to the collection of a DNA sample for the submission

16   to the combined DNA Index System.  Further, you must not

17   possess a controlled substance, and you must refrain from

18   any unlawful use of a controlled substance.

19        You must submit to one drug test within 15 days of

20   your release from custody and subsequent to the first test,

21   you shall submit to at least two additional periodic drug

22   tests.  Subsequent to the first test, you shall submit to at

23   least two additional periodic drug tests thereafter and not

24   to exceed eight drug tests per month.

25        Based upon the nature of the -- you shall also comply

1    with the standard conditions that have been adopted by this

2    Court and/or as set out in the judgment, which are imposed

3    because they establish the basic expectation for your

4    behavior while on supervised release and identify the

5    minimum tools needed by the probation office to keep

6    informed, report to the Court, and bring about improvement

7    in your conduct and condition.  Based upon the nature of the

8    offenses and your history and characteristic of sexually

9    abusing minor children, you are also to comply with the

10   following additional special conditions of supervised

11   release:  You shall register pursuant to the provisions of

12   the Sex Offender Registration and Notification Act or any

13   applicable state registration law.

14        You shall attend and participate in a mental health

15   treatment program and/or a sex offender treatment program as

16   approved and directed by the probation office.  You shall

17   abide by all program rules, requirements, and conditions of

18   the sex offender treatment program, including submission to

19   polygraph testing to determine if you are in compliance with

20   these conditions of release.  You may be required to

21   contribute to the cost of the services rendered in an amount

22   to be determined by the probation office, based upon your

23   ability to pay.  Any refusal to submit to assessment or

24   tests as scheduled is a violation of the conditions of

25   supervision.

1          You shall not be at any residence where any children

2     under the age of 18 reside without the prior permission of

3     the United States Probation Office.

4          You shall not be associated with children under the

5     age of 18 except in the presence of a responsible adult who

6     is aware of your background and your current offenses, and

7     who has been approved by the United States Probation Office.

8          You shall submit to a search and seizure -- search

9     conducted by the United States Probation Office for your

10    person, residence, vehicle, office, and/or business at

11    reasonable times and in reasonable manners, based upon

12    reasonable suspicion of contraband or evidence of a

13    violation of conditions of supervised release.  Failure to

14    submit to such a search may be grounds for revocation.

15         Mr. McGirt, based upon your financial profile as

16    outlined in the presentence report, the Court finds that you

17    do not have the ability to pay a fine, and, therefore, no

18    fine will be imposed.

19         It is further ordered, however, that you shall pay a

20    $100 special monetary assessment per count for a total of

21    $300.  This assessment is to be paid immediately to the

22    United States Court Clerk for the Eastern District of

23    Oklahoma.

24         The Court recognizes that the United States Sentencing

25    Guidelines are advisory and not mandatory, but has

1    considered the sentencing guidelines along with all the

2    factors set forth Title 18, U.S.C., Sections 3553(a) to

3    reach an appropriate and reasonable sentence in this case.

4    In determining a sentence, the Court has considered the

5    nature and circumstances of the offense, defendant's

6    personal characteristics and defendant's criminal history,

7    sentencing disparities and the types of sentences available.

8    The Court has further taken into consideration the

9    sentencing guideline calculations contained within the

10   presentence report.  This case involved the defendant, a

11   repeat sexual predator, who was 47 years old at the time of

12   the offenses, sexually abusing his wife's four-year-old

13   granddaughter.  Defendant did so while the child was in his

14   care while her grandmother was at work.  The minor victim

15   considered the defendant to be a grandfather-like figure.

16   The defendant threatened the minor victim to not tell anyone

17   about the abuse.  As outlined above, the defendant -- as

18   outlined above, the Court finds the defendant to be a

19   dangerous individual with a high risk of recidivism.

20   Defendant victimized the minor victim in this case shortly

21   after being released from incarceration for sexually abusing

22   two other young boys, ages five and eight.  The defendant

23   has not demonstrated any sense of remorse or concern for any

24   of his victims whatsoever, and the victim has suffered

25   significantly because of the defendant's crimes.

1          The sentence prescribed by this Court, which is

2    outside the advisory guideline range, reflects the

3    seriousness of the offenses, will serve as an adequate

4    deterrent to this defendant, promote respect for the law and

5    provide just punishment for the offenses and is based on

6    justifiable reasons.  This sentence affords adequate

7    deterrence to criminal conduct and protects the public from

8    further crimes by this defendant.  The Court has further

9    determined that this sentence is reasonable and sufficient,

10   but not greater than necessary, to meet the requirements and

11   objectives set forth in Title 18, U.S.C., Sections 3553(a).

12   Sentencing disparities among defendants were considered in

13   determining an appropriate sentence in this case.

14          To the extent defendant is ever released, the term of

15   supervised release is appropriate with special conditions

16   based upon the aforementioned factors and will allow this

17   defendant to be monitored for future violations and receive

18   appropriate mental health and substance abuse treatment.

19   Restitution, as noted, is mandatory but has been

20   unascertainable in this case.

21          The Court notes for the record that based upon all

22   presently known facts and legal principles, this is the same

23   sentence the Court would impose if given the broadest

24   possible discretion, and the same sentence the Court would

25   impose notwithstanding any judicial findings of fact by

1    adoption of the presentence report or at this hearing.

2         Mr. McGirt, I have the duty to advise you, sir, that

3    you have a right to appeal the sentence that has been

4    imposed.  Any such appeal must be filed within 14 days of

5    the Court's judgment.  Mr. O'Carroll will remain your

6    counsel during this 14-day time of appeal.  If you wish to

7    appeal and cannot afford an appeal, there are forms that can

8    be completed by you in the court clerk's office whereby you

9    may institute an appeal without prepayment of costs.

10        Mr. O'Carroll, is there anything further at this time

11   on behalf of Mr. McGirt?

12             MR. O'CARROLL:  Yes, Your Honor.  I believe you

13   did not hear him say -- express remorse for the boys in

14   Oklahoma City when you were reading from your decision.  He

15   did say it this day.

16             THE COURT:  I heard for the first time some --

17   some expression of remorse, but I think it was very

18   marginal.

19             MR. O'CARROLL:  Yes, Your Honor.

20             THE COURT:  Okay.  Anything further?

21             MR. O'CARROLL:  No, Your Honor.

22             THE COURT:  Ms. McAmis, anything further on behalf

23   of the government?

24             MS. McAMIS:  No, Your Honor.

25             THE COURT:  The defendant is remanded to the

1    custody of the United States Marshal Service.

2         Court is adjourned.

3         (PROCEEDINGS CONCLUDED.)

4

5                        REPORTER'S CERTIFICATE

6              I, Joanna Smith, Registered Professional Reporter

7    and Certified Shorthand Reporter, in and for the State of

8    Oklahoma, do hereby certify that the foregoing is a correct

9    transcript from the official proceedings in the

10   above-entitled matter.

11

12                   CERTIFIED:   s/Joanna Smith_____
                                  Joanna Smith, CSR-RPR
13                                United States Court Reporter
                                  101 North 5th Street
14                                Muskogee, Oklahoma  74401

15

16

17

18

19

20

21

22

23

24

25