**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

```
UNITED STATES OF AMERICA,    )
                             )
                Plaintiff,   )
                             )
-v-                          ) Case No.
                             ) 20-CR-50-JFH
JIMCY MCGIRT,                )
                             )
                Defendant.   )
                             )
```

JURY TRIAL
VOLUME I

BEFORE THE HONORABLE JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE

NOVEMBER 4, 2020

SHELLEY OTTWELL, RPR, CSR
United States Stenographer
P.O. BOX 607
Muskogee, Oklahoma 74402

**A P P E A R A N C E S**

ON BEHALF OF THE GOVERNMENT
Sarah McAmis, Esq.
and
Courtney Jordan, Esq.
United States Attorney's Office
520 Denison Ave.
Muskogee, Oklahoma 74401


ON BEHALF OF THE DEFENDANT
Joe White, Junior, Esq.
and
Kate C. White, Esq.
White & Weddle
630 NE 63rd Street
Oklahoma City, Oklahoma 73105


Richard O'Carroll, Esq.
O'Carroll & O'Carroll
2171 N. Vancouver Avenue
Tulsa, Oklahoma 74127


**I N D E X**

Opening statement by the government        15

Opening statement by the defense          23

**EXAMINATION INDEX**

*EVIDENCE PRESENTED BY THE UNITED STATES*:
DOUGLAS W. STEWART, D.O.
     DIRECT BY MS. MCAMIS . . . . . . . . . 30
     CROSS BY MR. WHITE, JUNIOR . . . . . . 57
     REDIRECT BY MS. MCAMIS . . . . . . . . 90
     CROSS BY MR. WHITE, JUNIOR . . . . . . 99

**EXHIBIT INDEX**

                                        MAR ADM
Defendant's Exhibit
  14     Bates Stamp 413 - medical record   69  69

Stenographer's certification              106

*UNITED STATES DISTRICT COURT*

**COURT IN SESSION**

1

2                    (On the record at 3:14 p.m.)

3              THE COURT:  You may be seated.

4              All right.  Folks, thanks for coming

5     back.  I'm sorry.  I think we had some technical

6     difficulties with one of the computers, but I

7     appreciate your patience.

8                    Members of the jury, now that you've

9     been sworn, I will give you some preliminary

10    instructions to guide you in your participation

11    in the trial.  At the end of the trial, I will

12    give you more detailed guidance on the law and

13    how you will go about reaching your decision, but

14    now I simply want to generally explain how the

15    trial will proceed.

16                   Beginning with these preliminary

17    instructions and during the trial, you will hear

18    me use a few terms with which you may not be

19    familiar.  Let me briefly now explain some of

20    those common terms:  You will hear me often refer

21    to "counsel," and that's another way of saying

22    the "lawyers" or "attorneys."  I will sometimes

23    refer to myself as the "Court;" the government

24    and the defendant are sometimes called "the

25    parties" to this case.

1          As members of the jury, it will be your

2    duty to find from the evidence what the facts

3    are.  You, and you alone, are the judges of the

4    facts.  You will then have to apply those facts

5    to the law as the Court will give it to you.  You

6    must follow that law, whether you agree with it

7    or not.  Nothing the Court may say or do during

8    the course of this trial is intended to indicate

9    to you what your verdict should be, nor should

10   you take anything that happens or any statement

11   made by the Court as indicating what your verdict

12   should be.

13          The evidence from which you will find

14   the facts will consist of testimony of the

15   witnesses, documents or other things received

16   into the record as exhibits and any facts the

17   lawyers agree or stipulate to, or that the Court

18   may instruct you to find.

19          Certain things are not evidence and must

20   not be considered by you as evidence:

21   statements, arguments, or questions by the

22   lawyers themselves are not evidence; objections

23   to questions are not evidence.  The parties may

24   sometimes present objections to some of the

25   testimony or to some of the questions or

exhibits.  An objection is a proper method of requesting a ruling from the court concerning the evidence.

Lawyers may have an obligation to their respective clients to make an objection when they believe evidence is being offered that may be improper under the rules of evidence.  You should not be influenced by an objection or by the Court's ruling on it.  When I sustain an objection, I am excluding that evidence from the trial for good reason.  You must not consider any evidence to which an objection has been sustained or which I have instructed you to disregard. When you hear that I have overruled an objection, I am permitting that evidence to be admitted and considered by you.  Treat the answer like any other.

If you are instructed that some of the evidence is received for a limited purpose only, you must follow that instruction.  When I say "admitted into evidence" or "received into evidence," I mean that this particular statement or this particular exhibit is now part of the trial and may be considered by you in making the decisions you must make at the close of the case.

1          Statements or exhibits, which are not

2     admitted into evidence, may not be considered by

3     you in reaching your verdict.  Testimony that the

4     Court has excluded or told you to disregard is

5     not evidence and must not be considered.

6     Anything that you have seen or heard outside of

7     the courtroom is not evidence and must be

8     disregarded.  You are to decide this case solely

9     on the evidence presented here in this courtroom.

10          There are two kinds of evidence:  direct

11     evidence and circumstantial evidence.  Direct

12     evidence is direct proof of facts, such as

13     testimony of an eye witness.  Circumstantial

14     evidence is proof of facts from which you may

15     infer or conclude that other facts exist.  I will

16     give you further instructions on these as well as

17     other matters at the end of the case, but have in

18     mind that you may consider both kinds of

19     evidence.

20          It will be up to you to decide which

21     witnesses to believe, which witnesses not to

22     believe, and how much of any witness's testimony

23     to accept or reject.  I will give you some

24     guidance for determining credibility of witnesses

25     at the end of the case.

1           Transcripts of witness's testimony

2     during this trial will not be available to you

3     during deliberations, and you must rely on your

4     own recollection of a witness's testimony.  If

5     any reference by the Court or counsel to a

6     witness's testimony conflicts with your own

7     recollection, it is your own recollection that

8     should control your deliberations and not the

9     statement of the Court or of counsel.

10          During the course of the trial, I may

11    have to interrupt the proceedings to confer with

12    the attorneys about rules of law that should

13    apply or other matters.  Sometimes we will talk

14    briefly here at the bench but sometimes these

15    conferences may take more time, so I may excuse

16    you from the courtroom.  I will try to avoid

17    these types of interruptions whenever possible,

18    but please be patient with us if the trial seems

19    to be moving more slowly because conferences

20    oftentimes actually save time in the end.

21          No statement, ruling, remark, or comment

22    which I may make during the during the course of

23    this trial is indicated to indicate any opinion

24    as to how you should decide this case and none of

25    it is intended to influence you in any way in

1    your determination of the facts.  I may, for

2    example, ask questions of witnesses.  If I do so

3    it is for the purpose of explaining matters,

4    which I feel should be brought out, and not in

5    any way to indicate my opinion about the facts or

6    to indicate the weight you should give to the

7    testimony of the witnesses so questioned.

8            I may also find it necessary, for

9    example, to admonish the lawyers or remind them

10   about certain things.  If I do, you should not

11   show any prejudice to either lawyer or their

12   clients because I have found it necessary to make

13   an admonition or a correction.

14           As you now know this is a criminal case.

15   There are basic rules about a criminal case that

16   you must keep in mind,

17           First the defendant is presumed

18   innocent.  The indictment against the defendant

19   brought by the government is only an accusation

20   and nothing more.  It is not proof of guilt or

21   anything else.  The defendant, therefore, starts

22   out with a clean slate;

23           Second, the burden of proof is on the

24   government.  The defendant has no burden to prove

25   his innocence or to present any evidence or to

testify.  Since the defendant has the right to remain silent, the law prohibits you in arriving at your verdict from considering that the defendant may not have testified;

Third, the government must prove the defendant's guilt beyond a reasonable doubt.  I will give you further instructions on this point later, but bear in mind that it is in this respect that a criminal case is different from a civil case.

Now, a few words about your conduct as jurors:

First, I instruct you that during the trial you are not to discuss this case with anyone or permit anyone to discuss it with you or remain within hearing distance of anyone discussing it.  If anyone should try to talk with you about this case, please bring it to the Court's attention immediately.  Until you retire to the jury room at the end of the case to deliberate on your verdict, you are simply not to talk about this case;

Second, during the trial you should not talk or speak to any of the parties or the lawyers or witnesses involved in this case.

1    Don't even pass any of the time of day with them.

2    It is important that you not only do this because

3    justice demands it, but we also need to not give

4    the appearance that you may be doing anything

5    improper even if innocent.  If a person from one

6    side of the lawsuit sees you talking to a person

7    from the other side, even if it is for a simple

8    gesture just to say hello, any unwarranted or

9    unnecessary suspicion about fairness could be

10   aroused.  Again, if a lawyer or party does not

11   speak to you when you pass or pass in the hall or

12   see you outside the courtroom, don't take

13   offense.  It's simply because they are not

14   permitted to talk with you;

15           Third, do not read or listen to anything

16   touching upon this case in any way.  Do not read

17   a newspaper article, listen to a radio broadcast,

18   view any television program or anything else in

19   which this case is being discussed.  Do not view

20   anything on any social media platform and

21   certainly do not post anything about this case;

22           Fourth, do not try to do your own

23   independent research of any kind about this case.

24   You, as the jurors, must decide this case solely

25   on the evidence presented here within the four

walls of this courtroom.  This means that during
the trial you must not conduct any independent
research about this case whatsoever, any matters
concerning this case, the individuals involved in
this case, or anything of the sort.

In other words, you should not consult
with any dictionaries, any reference materials,
search the internet, websites, look at any blogs
or use any other electronic means to obtain any
information about this case.  Please, do not try
to find about -- information about this case from
any source outside this courtroom.

Until you retire to deliberate, you may
not discuss the case with anyone, even your
fellow jurors.  After you retire to deliberate,
you may begin discussing the case with your
fellow jurors but you cannot discuss this case
with anyone until you have returned your verdict
and the case is concluded.

I know that many of you use cell phones,
internet, laptops, and other tools of technology.
You must not talk to anyone at anytime about this
case using these tools to communicate
electronically with anyone about the case, this
includes your family and friends.

1    I expect and trust that you will inform

2  me if you become aware if any of your other

3  jurors may violate these instructions.

4    Finally, do not form any opinion about

5  this case until all of the evidence is in.  Keep

6  an open mind until you start your deliberations

7  until the case is concluded.

8    You may not take notes during the course

9  of this trial.  There are several reasons for

10  this.  It is often difficult to take notes and at

11  the same time pay attention to what a witnesses

12  may be saying.  Furthermore, in a group of your

13  size certain persons may take better notes than

14  others.  There is a risk that jurors who do not

15  take good notes will depend upon the notes of

16  others.  The jury system depends upon all 12

17  jurors paying close attention and arriving at a

18  unanimous decision.

19    There may have been some publicity about

20  this case prior to trial.  But keep in mind that

21  any statements contained in some of any of these

22  accounts, of course, may not be accurate and may

23  have come from individuals who will not be

24  present in court, and who therefore will not be

25  able to be seen and evaluated by you as the jury

like all of the other witnesses, and will not be
examined or cross-examined by either of the
parties under oath.  You must lay aside and
completely disregard anything that you may have
heard or read about this case outside of this
courtroom because your verdict must be based
solely and exclusively on the evidence presented
here in court in accordance with my instructions
to you at the close of the case about the law
that you must apply to the evidence.  You may not
rely upon anything that you hear or see outside
of this courtroom in reaching your verdict.

I will briefly outline the course of the
trial.  First, the government will make an
opening statement, which is simply an outline to
help you understand the evidence as it comes in.
Next, the defendant's attorney may, but does not
have to, make an opening statement.  Remember,
opening statements are not evidence.  They are
simply a road map to show you what is coming
ahead.  The government will then present its
witnesses, and counsel for the defendant may
cross-examine them.  Following the government's
case the defendant may, if he wishes, present
witnesses whom the government may cross-examine,

1   although the defendant is not required to present

2   any witnesses.  I remind you that the defendant

3   is presumed innocent and it is the government

4   that must prove the defendant's guilt beyond a

5   reasonable doubt.  If the defendant submits

6   evidence, the government may introduce rebuttal

7   evidence.

8           After all the evidence is in, I will

9   instruct you on the law and then the attorneys

10  will present their closing arguments to summarize

11  and help interpret the evidence for you.

12  Arguments of counsel are not evidence.  After

13  that, you will then retire to deliberate on your

14  verdict.

15          Our general plan during this trial will

16  begin to each day at 9:00 a.m.  We will take a

17  15-minute break during the middle of the morning,

18  then go to around noon, and then take a break

19  sometime in the afternoon for about 15 minutes.

20  We will generally recess at 5:00.  However, it

21  could happen that we might go a little later in

22  the evening as necessary.

23          Does either side wish to invoke the rule

24  of sequestration?

25          MS. MCAMIS:  The government does, your

1   Honor, with the exception of the case agent who

2   has been designated.

3           THE COURT:  I understand.

4           All right.  The rule of sequestration

5   has been invoked, and it will require all

6   witnesses, except litigant's representives, to

7   wait outside the courtroom until they are called

8   as witnesses.  They should be in or near the

9   courtroom so that they may be called as

10   necessary.  They also should be admonished not to

11   discuss their testimony with any other witness.

12           Is the government ready to proceed with

13   opening statement?

14           MS. MCAMIS:  Yes, your Honor.

15           THE COURT:  Ms. McAmis, you may proceed

16   with your opening statement.  You have 20

17   minutes.

18           MS. MCAMIS:  In the summer of 1996

19   BrieAnna Coker turned four years old.  She should

20   have spent the summer doing what every other

21   four-year-old little girl does, playing with

22   Barbies, learning how to ride a bike with

23   training wheels, but instead that summer when she

24   turned four, Brie learned what it felt like to be

25   violated.  That summer when she turned four, Brie

1    learned what it felt like to have a grown man

2    touch her vagina.  Brie learned what it felt like

3    to have a grown man put his fingers inside of her

4    vagina.  Brie learned what it felt like to have a

5    grown man put his mouth and his tongue on her

6    vagina, and Brie learned what it felt like for

7    her at four years old to have to touch and rub a

8    grown man's penis.

9          As we sit here today, Brie is no longer

10   that four-year-old little girl.  She's now a

11   28-year-old woman.  But as you will see and hear

12   when Brie testifies, the summer of 1996 has

13   impacted and affected every part of her life.

14         To understand what happened to Brie and

15   what she experienced, you have to understand a

16   little bit about her family and her family

17   dynamics.

18         Brie's mother is De Ette Kuswane.

19   De Ette had a sister who she was very close to,

20   Nenna.  Nenna is Brie's aunt.  Unfortunately,

21   Nenna has since died.  De Ette and Nenna's mother

22   is Norma Blackburn.  Norma is Brie's grandmother.

23   Norma met the man who she thought was the love of

24   her life around 1992, the defendant, Jimcy

25   McGirt.  Norma and the defendant dated, they

quickly were married, and they began living
together as husband and wife.

De Ette will tell you that she and her
sister Nenna, they had a good relationship with
their mother, they had a good relationship with
the defendant.  It was a bit bumpy at times as it
sometimes is when a stepfather comes into the
picture, but generally everyone got along.
Generally, there were no problems.  Brie loved
spending time with her grandma, Norma, and Brie
accepted the defendant as her grandpa.  Brie
trusted him in a way that a little girl only
trusts a grandpa.

On August 8, 1996, De Ette left to go on
a trip to Mexico.  The plan was for Brie to stay
with her grandma, Norma, and her grandpa, the
defendant, for eight days until De Ette returned
home from the trip.  Norma was working at the
time as a nurse in the neonatal intensive care
unit at St. Francis Hospital in Tulsa, and she
generally worked 12-hour shifts.  The defendant
was working from home detailing cars, and so he
was in charge of babysitting Brie the whole time
Norma was at work and the whole time she was
driving to and from work.  They lived in a Broken

1   Arrow address in Wagoner County.

2          So the defendant was in charge of

3   babysitting Brie, and that is when it would

4   happen.  That is when the defendant would touch

5   Brie with his hands, that is when the defendant

6   would put his fingers in her vagina, that is when

7   the defendant used his mouth and tongue on her

8   vagina, and that is when the defendant would make

9   Brie touch and rub his penis in a way that no

10  child should ever experience.

11         The defendant sexually abused Brie in

12  the house, in the bedroom, on the couch, in his

13  truck, anywhere and any time that he could while

14  he was alone with her.

15         When De Ette returned home from her trip

16  and she went to pick Brie up from Norma and the

17  defendant, Brie was ready to go.  She was ready

18  to get out of that house, and De Ette thought it

19  was just because Brie had missed her so much and

20  just because she was ready to go home and have

21  some quality mother-daughter time, but it was so

22  much more than that.

23         Brie did what children do.  She waited

24  about a week until she began to feel safe enough

25  to open up and tell her mother what had happened

1    to her during those eight days.  Needless to say

2    when De Ette listened to Brie describe in the

3    words and in the manner of a four-year-old child

4    what had happened to her, De Ette was heartbroken

5    and absolutely sick.  The police became involved,

6    the Department of Human Services became involved.

7    Brie was taken to the doctor for a physical

8    examination.

9            You will hear from Dr. Douglas Stewart.

10   He is a board certified pediatrician who has been

11   practicing in the field of pediatrics for some 30

12   years.  Dr. Stewart will be here to tell you

13   about Brie's examination that took place in

14   September of 1996.  He will tell you that during

15   that examination four-year-old Brie, in the way

16   that a four year old does, described and said,

17   "Grandpa put his fingers inside my private part."

18   She said, "Grandpa asked me to touch his private

19   parts with my hand."

20           Dr. Stewart will tell you that when a

21   little girl is seen for a sexual abuse

22   examination some people may expect to see a lot

23   of damage.  However, he will tell you that the

24   human body is actually really remarkable.  Any

25   mom who has given birth can tell you that.

1  Dr. Stewart will explain that the inside of the
2  vagina is like the inside of your mouth.  He will
3  tell you that you can bite or cut or scratch the
4  inside of your mouth today, there might be a
5  sore, but a few days from now it will be
6  completely gone, completely healed and there will
7  be no sign of it.

8         Dr. Stewart will explain that it is
9  normal to be normal, and he will tell you about
10  the hundreds of pediatric patients he has seen
11  and all of the research in the field which
12  demonstrates that even on examinations of
13  pregnant teenagers, those who have obviously been
14  penetrated because they are pregnant, still have
15  normal examinations.

16         You will hear that Brie's examination
17  was consistent with the history provided.

18         De Ette will tell you how her baby girl
19  changed that summer.  She will tell you that Brie
20  was a happy, outgoing -- she was a little girl
21  with a wonderful spirit until after that trip.

22         After the stay with the defendant, Brie
23  was angry.  Brie threw temper tantrums.  Brie
24  began acting out.  Brie became extraordinarily
25  clingy.  She was a different child.

1          In the meantime, Brie was with her

2    cousin Sabrina, Nenna's daughter.  Brie told

3    Sabrina, who was also a child at the time, what

4    had happened to her from Grandpa.  And Sabrina

5    went and immediately got her mom Nenna.  Nenna

6    came into the room, had Sabrina stay in the room

7    with Brie so that Brie would feel more

8    comfortable, and Nenna talked to Brie about what

9    the defendant had done to her and Nenna tape

10   recorded what Brie was disclosing.

11          Unfortunately, the heartbreak for this

12   family was not over.  Once De Ette knew and once

13   Nenna knew, they went to their mother Norma and

14   they told her what her husband, the defendant,

15   had done to Brie.

16          For whatever reason at the time, Norma

17   chose to stand by her man.  Norma had spoke out

18   on his behalf.  She stayed married to him and

19   even after he no longer could live with her, she

20   continued to write letters to him and she

21   continued to accept the letters that he wrote to

22   her until sometime around the year 2000.

23          Norma received a letter from the

24   defendant where he finally admitted what he had

25   done to Brie.  The defendant finally apologized

1    for what he had done to Brie, and the defendant

2    wrote in the letter that the devil had made him

3    do it.  We don't still have the letter after some

4    20-odd years, but you will hear from both Norma

5    and De Ette about that letter and the impact that

6    that letter had on them.

7              In fact, although Norma should have

8    realized much earlier than she did, the letter

9    was enough for Norma to finally realize that she

10   had been wrong about her husband, and Norma

11   divorced him and she cut him off and now is in a

12   close relationship with her granddaughter again.

13        That brings us to today.  You will hear how

14   the summer of 1996 completely changed Brie's life

15   and completely changed Brie's personality.  You

16   will hear about the anxiety and the depression

17   and the lack of trust that she suffers from to

18   this day.

19        At the end of this trial, on behalf of the

20   United States government, I will come back in

21   front of you and I will ask you to find this

22   defendant guilty for the sexual abuse that he

23   perpetrated on Brie.  At the end of this trial,

24   you will have all of the evidence that you need

25   to do just that.  Thank you.

```
 1            THE COURT:  Mr. O'Carroll, does the
 2   defendant wish to make an opening statement now
 3   or reserve until letter?
 4            MR. WHITE, JUNIOR:  We're going to do it
 5   right now.
 6            THE COURT:  Okay.  Please proceed,
 7   Mr. White.
 8            MR. WHITE, JUNIOR:  Thank you, your
 9   Honor.
10            THE COURT:  You have 20 minutes.
11            MR. WHITE, JUNIOR:  May it please this
12   Honorable Court, counsel for the government,
13   we're going to present evidence through our
14   examination of their witnesses, the following,
15   and we intend to prove the following:
16            In about 1991, Mr. McGirt and Norma
17   Blackburn were in a relationship.  And you're
18   going to hear that at the time they were in a
19   relationship there were various children of
20   Norma's that were living in that house, and they
21   lived in that house until Ms. Blackburn, Norma,
22   and Mr. McGirt, Jimcy McGirt, got married.  Some
23   moved out a little quicker, De Ette; others moved
24   out after.  But make no mistake about this, that
25   event of forcing them to move out of their
```

1    mother's house put a target on Mr. McGirt's back,

2    and the target on Mr. McGirt remained until

3    De Ette waited about a month and a week to

4    purportedly report this allegation of sexual

5    assault by Mr. McGirt.

6         So let's talk about it:  '91 living with

7    Norma there was Matthew, her son; there was Nenna

8    with her two children--Nenna was a daughter;

9    there was De Ette, and De Ette was living there

10   with her boyfriend; there was a fellow named Bill

11   Gray that was seeing Nenna that was living in

12   that house, and they all move out.

13        You're going to hear as time goes on we

14   get into 1996, there's about a four- or five-year

15   period, four-year period -- because when De Ette

16   goes to Mexico--I think it was Cancun--De Ette

17   leaves her three-year-old daughter, who is going

18   to turn four on August 13th, with her mother and

19   Mr. McGirt.  Her daughter turns four years old on

20   August 13, 1996.  BrieAnna.

21        Now, you're going to hear during this --

22   and that's a qualified period of time.  The

23   government has charged Mr. McGirt that at some

24   point between August 8th and August 15th, these

25   dastardly deeds purportedly occurred, some time

1    during that seven-day period.  But let me assure

2    you of something:  We know Norma is going to

3    testify, and we know Norma is a nurse.  And she's

4    a nurse that will know, and would know at the

5    time, if anything was wrong with her grandbaby,

6    if anything was wrong with BrieAnna, the three

7    year old about to be four.  She's going to

8    testify to you that not a thing -- she didn't see

9    a thing that would raise a suspicion that there

10   was anything going on.

11        You're going to hear from Matt.  We

12   anticipate that you're going to hear testimony

13   from others that were around that seven-day

14   period of time.  Nothing.  Nothing.  Nothing

15   happened.

16        Norma is going to talk to you about

17   going to work.  Norma is going to talk to you

18   about getting home.  Norma is going to talk to

19   you about how everything was fine.  Nothing.

20        Now, you heard just now the government

21   saying that De Ette knew within a week of coming

22   home there was something wrong.  Now, remember

23   these dates:  August 8th to August 15th.  The

24   first time De Ette ever chooses to do anything is

25   on September 10th when she writes out a statement

to the Wagoner County Sheriff's Department; on
September 10th, a month later.  Then on September
11th, you're going to hear that they meet with
some folks at the Wagoner County Sheriff's
Department, and then you're going to hear on
September 12th that she's examined.  And there is
no sexual assault examination, no SANE nurse,
sexual assault nurse exam, because there's
nothing wrong with her.

You will see the one document that we
will put into evidence of the examination,
Dr. Stewart's examination.  Normal, normal,
normal, normal, normal, normal, normal.

You'll hear the mother is always there
when she's trying to -- when BrieAnna is trying
to say these words.  I want you to listen to the
words of a three year old who just turned four,
listen to the words that she uses.

Let me assure you the testimony that
you're going to hear is that De Ette was hostile.
Hostile.  That's from Norma, her mother.  Her own
mother.  How was De Ette towards Mr. McGirt when
she had to move out?  Hostile.  De Ette got
pregnant with Brie back in '91 and went to the
McDonald's House, and from that day forward

1    De Ette was hostile to Mr. McGirt.  Period.

2           So I tell you a target on his back, the

3    target became that moment when she had to move

4    out of the house, and Norma will tell you that.

5           Now, we're going to talk about everyone

6    that was around August 8th to August 15th.

7    You're not ever going to hear, you're not ever

8    going to see any evidence associated with

9    BrieAnna having any kind of physical injury.

10   You're going to hear -- I believe maybe the first

11   witness is going to be the doctor, Dr. Stewart.

12   We'll get to cross-examine Dr. Stewart about his

13   examination.  You won't ever hear anything about

14   any physical evidence, any blood.  She'll say,

15   Well, I think he put his finger inside of me in

16   the bathtub.  Nothing.  Norma will tell you, I'm

17   the one that gave her the baths, not Mr. McGirt.

18   So we're going to have to break it down in that

19   seven-day period of time about where, if

20   anything, if anything could have possibly

21   happened, when could it have possibly happened

22   and what happened thereafter.  Because the

23   evidence is that we're going to prove there was

24   never anything like that that happed to this

25   three-turning-four-year-old girl.

1         Now, the state says -- the government

2    says we have a -- we have a recording they

3    recorded.  Nenna recorded this little

4    conversation that Nenna purportedly had with

5    BrieAnna.  There is no recording.  There is no

6    recording.  Norma says I got this letter where he

7    said the devil made me do it.  There is no

8    letter.  There is no letter.  And there's no

9    physical evidence.

10        You're going to hear when De Ette comes

11   back from that trip from Mexico, you're going to

12   hear that BrieAnna wasn't afraid of her grandpa,

13   wasn't afraid of Mr. McGirt, wasn't scared of

14   Mr. McGirt.  Didn't cry whenever Momma took her.

15   There was none of that.

16        It was a month later when Momma put the

17   story up.  So we're going to hear all this in

18   this courtroom, and at the end of the day we're

19   going to ask you to return a verdict of not

20   guilty on all counts.  There's no evidence of any

21   of this happening.

22        Thank you.

23        THE COURT:  Ms. McAmis, is the

24   government prepared to call its first witness?

25        MS. MCAMIS:  Yes, your Honor.

1          THE COURT:  All right.  Please, proceed.

2          MS. MCAMIS:  Your Honor, the government

3   calls Dr. Douglas Stewart.

4          (Witness duly sworn.)

5          THE COURT:  Thank you.  Be seated, please.

6          All right.  Mr. Stewart, if you could, if

7   you're comfortable, lower your black mask a little

8   bit so the jury can see you and be sure to lean

9   into the microphone.  Sometimes it's hard for us to

10  hear as that microphone is a little bit tricky with

11  that covering on it.

12         MS. MCAMIS:  May I please proceed, your

13  Honor?

14         THE COURT:  Please proceed.

15                 **_DOUGLAS W. STEWART, D.O._**

16         after having been first duly sworn,

17  testifies as follows, to wit:

18                      **DIRECT EXAMINATION**

19  **BY MS. MCAMIS:**

20  Q.  Dr. Stewart, I'd would like to tell you I'm

21  kind of turning sideways because of COVID

22  restrictions we have a different layout in the

23  courtroom, okay, and that's also why you need to

24  speak into the microphone; all right?

25       Could you tell us your name, please.

1    A.    Douglas Wayne Stewart.

2    Q.    How are you employed, sir?  Currently.

3    A.    Yeah.  Full time?

4    Q.    Yes.  Currently.

5    A.    My employer?

6    Q.    Yes.

7    A.    Blue Cross Blue Shield of Oklahoma.

8    Q.    Can you tell us a little bit about your

9    educational background?

10   A.    Yeah.  I have a bachelor's degree from OSU.

11   I graduated with a Doctor of Osteopathic Medicine

12   Degree from what was then Oklahoma College of

13   Osteopathic Medicine and Surgery.  I went into

14   private practice.  I went back to school at night

15   and earned a Master of Public Health degree, and

16   that's my educational background.

17   Q.    When did you graduate with your D.O. degree?

18   A.    1985.

19   Q.    And when did you earn your Master's of Public

20   Health degree?

21   A.    1993.

22   Q.    Can you tell us where you completed your

23   internship, and when?

24   A.    Yes.  It is what is now Oklahoma State

25   University Medical Center.  Internship was '85 to

1    '86.

2    Q.   Did you complete a residency in the field of

3    pediatrics?

4    A.   I did.

5    Q.   When was that and where?

6    A.   I completed that in 1988 at the same

7    institution.

8    Q.   Are you board certified in the field of

9    pediatrics?

10   A.   Yes.

11   Q.   Could you explain to us what board

12   certification is?

13   A.   Yeah.  When I took it, the certification was

14   a series of some written exams and some oral

15   exams after you been out in practice for a number

16   of years to establish that you met a threshold of

17   competency.

18   Q.   When did you obtain that board certification?

19   A.   1991, as soon as I had three years of

20   practice.

21   Q.   Have you served any academic appointments in

22   your career?

23   A.   Yes.  I worked full-time as an academic

24   pediatrician from 1992 until 2016.

25   Q.   Can you tell us what working full-time as an

1   academic pediatrician, what does that mean?  What
2   does that entail?
3   A.   Well, since it's a teaching institution
4   there's a teacher role, so I taught medical
5   students and residents, nurse practitioners, or
6   PA students.  I also engaged in practice at a
7   certain amount of time, so I saw patients
8   independently, and then there's a certain amount
9   of scholarly work that's expected in most
10  settings like that.  So either doing some
11  research, policy analysis, publication.
12  Q.   You explained that you were in part in charge
13  of teaching other practitioners in the area of
14  pediatrics.
15       Did you serve as the program director for the
16  pediatric residency program at OU Health Sciences
17  Center of Tulsa?
18  A.   I served a number of years as the assistant
19  program director of pediatrics.  Also the
20  co-program director for combined internal
21  medicine and pediatric.
22  Q.   What did those job responsibilities entail?
23  A.   It involved recruiting prospective residents,
24  evaluating residents, assuring that the program
25  met accreditation criteria, and that the

1   residents were eligible to take certification

2   exams by the time they completed their training.

3   Q.   Are you a fellow in the American College of

4   Osteopathic Pediatricians?

5   A.   I am.

6   Q.   Is it -- have you ever received any honors or

7   awards for your teaching medical personnel in the

8   field of pediatrics?

9   A.   Yes.  I've received a couple of awards.

10  Q.   Specifically, I want to ask if you've

11  received the Academy of Teaching Scholars in

12  Excellence Award, the -- I don't even know how to

13  say this -- A-E-S-C-U-L-A-P-I-A-N Award?

14  A.   Aesculapian.

15  Q.   There you go.  The Daniel Plunkett Teaching

16  Award.  Are those some of the times that you have

17  been honored?

18  A.   Yes, ma'am.

19  Q.   Have you -- has your work in the field of

20  pediatrics been published?

21  A.   Yes.

22  Q.   Can you explain to us what that means, to be

23  published, as a pediatrician?

24  A.   Well, it's in a peer-reviewed journal, then

25  it's been held up to the scrutiny by other

1    clinicians before it's published in textbooks.

2    There's an editorial function that reviews your

3    work, but generally people that are successful in

4    that have been able to meet a certain standard of

5    quality of their academic output to be able to be

6    published.

7    Q.   You told us that you are currently employed

8    by Blue Cross Blue Shield of Oklahoma; is that

9    correct?

10   A.   Yes.

11   Q.   In capacity do you serve that organization

12   and for how long?

13   A.   I've been there for a little over four years,

14   and I serve as a medical director in charge of

15   measuring the performance of clinicians and

16   systems, so I use my epidemiology training from

17   my MPH degree now to do that.

18   Q.   Can you tell us about your assistance to the

19   medical examiner's office for Rogers, Creek,

20   Osage, and Wagoner Counties?

21   A.   Yeah.  I worked part-time for the medical

22   examiner's office when I was a student.  And then

23   once I earned my license, the State of Oklahoma

24   still had a system where they relied on local

25   physicians to investigate deaths outside of the

1  urban areas, so I did that for a number of years

2  until they developed a system with non-physician,

3  full-time death investigators.

4  Q.   What is the board of medical-legal

5  investigations, and how have you served that

6  board?

7  A.   That's the state.  It's the governing board

8  for the state agency, the office of the Chief

9  Medical Examiner.  I've been a designee of a

10  couple of different statutory positions over a

11  number of years, including serving a stint as

12  chairman of that board and vice chairman.

13  Q.   So I've asked a little bit about your current

14  work with Blue Cross Blue Shield and your work

15  with the medical examiner and those types of

16  investigations, but now I want to return to your

17  years in the field exclusively in pediatrics.

18       I believe you said that was from 1996 to

19  2016, essentially full-time?

20  A.   Yes.  So I was a pediatric resident beginning

21  in '86, then I left full-time pediatric practice

22  in 2016.

23  Q.   So approximately 30 years?

24  A.   Yes.

25  Q.   Do you have any estimate in that 30-year time

1  period as to the number of children you have

2  treated as a pediatrician?

3  A.   Well, it would be in the thousands or tens of

4  thousands, I would imagine.

5  Q.   In your role as a pediatrician what are you

6  looking for when you evaluate a pediatric

7  patient?

8  A.   Oh, when you're looking at, you know, again

9  your general observations of the child's response

10  to their environment, their ability to

11  communicate, looking at the way they move.  So,

12  you know, all of these are potential clues to

13  finding something that might be wrong that you

14  could intervene.

15  Q.   When we talk about "the history," what does

16  that mean?

17  A.   There's a saying that if you listen to the

18  patient long enough they'll tell you what's wrong

19  with them.  So unfortunately sometimes it's

20  hurried a lot, but that's the talking that goes

21  on in terms of the information that's pertinent

22  to the reason that they're there or the chief

23  complaint.  But it also involves a history of

24  just their experience with disease, their medical

25  history, surgical procedures they've had, social

1  history, so where do they live, who cares for

2  them, where they go to school, that kind of

3  stuff.

4  Q.   Why is that history so important to you as a

5  pediatrician?

6  A.   Well, again, I think that it's quite true

7  that if you do -- if you are diligent and you ask

8  all the right questions and you listen carefully

9  and you don't interrupt, many times you have a

10  pretty good idea of what's going on before you

11  even examine the patient.

12  Q.   So when we're talking about things like

13  history, if I, as an adult, go to the doctor and

14  say my "throat hurts" is that part of the

15  history?

16  A.   Yes.

17  Q.   So as a pediatrician do you see babies,

18  infants, toddlers that are too young to be able

19  to communicate that to you?

20  A.   I do, and that's part of the challenge of it.

21  Q.   Who do you then obtain that history from if

22  they're too young to communicate it?

23  A.   Generally, it would be a knowledgeable

24  caretaker like a parent, relative, guardian

25  that's with them that knows the child.

1    Q.   If the child is old enough to communicate his

2    or her history, do you obtain that from the

3    child?

4    A.   Yes.  You want to recognize the agency of the

5    child to the best of their ability.

6    Q.   Have you had the opportunity in treating

7    thousands of pediatric patients to speak to

8    hundreds of different children about why they're

9    there to see you?

10   A.   Yes.

11   Q.   When there is a history of sexual abuse of a

12   child and you are seeing that child as a patient,

13   how do you go about conducting the physical

14   examination of that type of history?

15   A.   Again, that's a particularly vulnerable

16   patient so you typically, in terms of the exam,

17   you would go ahead and make the exam rather

18   comprehensive and start with rather non-invasive

19   things like listening to the heart, listening to

20   the lungs.

21        So generally a good rule for the younger-aged

22   children no matter what the cause is, and then

23   you gradually work up to a more invasive portion

24   of the exam, like using an otoscope to look in

25   the ears, look in the back of the mouth and then

1   you work your way down feeling of the abdomen.

2   If there's a need to examine the genitalia or the

3   anus, you would generally save that more the

4   towards the end.

5   Q.  It sounds like you're describing a

6   head-to-toe examination.  If they're complaining

7   of sexual abuse, why not just examine the

8   genitalia?

9   A.  Well, you know, first off to listen and then

10  just go right to that area, would potentially be

11  traumatic to the child.  So you're winning some

12  trust, plus, you know again with the nature of

13  the complaint as opposed to just a sore throat,

14  you want to do just a general survey of the child

15  to make certain that you're not missing anything.

16  Q.  When you do do a genital examination of the

17  child, is it like an adult woman when she goes to

18  the gynecologist?  Is it like that?

19  A.  No.  It's generally just a visual exam in a

20  general pediatric office.  There's no

21  gynecological table with stirrups.  The child --

22  again, when they're comfortable to be asked to

23  maybe just on their back lay on the table or even

24  on the parent's lap, maybe assume kind of like a

25  frog-leg position so the heels are together and

1   flexing the knees completely.

2       At most, the clinician might, you know, use

3   their thumbs to pull some of the tissue just

4   gently apart just to be able to see all of the

5   anatomical structures.  But that would be quite

6   different than what an adult woman would

7   experience.

8   Q.  When you're talking about a child's

9   anatomical structures and her genitalia, what is

10  it you're looking for or looking at?  Can you

11  describe that for us?

12  A.  Yeah.  You're looking for the age-expected

13  anatomical parts that again obviously persist

14  with an older woman, but you're looking also then

15  to see that the age -- the appearance matches

16  their age in terms of their hormonal influence

17  that occurs before puberty, and then during

18  puberty.

19      We're also generally looking for fairly rare

20  aberrations of development when some of the

21  hormonal influences go wrong or embryonic --

22  during fetal development things don't grow right.

23      Obviously, you know, when you look at a baby,

24  you can detect some of that.  Some of it's

25  difficult to appreciate until they start

1   progressing through their toddler years.

2   Q.   Dr. Stewart, in your experience as a

3   pediatrician have some parents expressed a belief

4   to you or some cultures expressed a belief that

5   you can tell by looking at a girl whether she's a

6   virgin or not, whether she has a hymen or not,

7   that type of thing?

8   A.   Yeah.  I've encountered that thought before.

9   Q.   Is that correct?

10   A.   No.

11   Q.   Can you explain that to us.

12   A.   There's so much variation in the development

13   of the external genitalia that it has been --

14   we've disproven that.  The best science indicates

15   that there's -- it's very rare that the hymenal

16   structure would be intact and would be

17   traumatized the first time there's been

18   penetration.

19   Q.   I want to ask when you're looking at that

20   part of the body is there another part of the

21   body that the tissue in the vaginal area is

22   similar to?

23   A.   Yeah.  The tissue of the vagina is a mucus

24   membrane.  So certainly inside of the mouth has a

25   very similar type of lining in terms of mucus

1  membranes.

2  Q.   So how is that important to you as a

3  pediatrician in terms of comparing what we might

4  see as some type of injury to the mouth and

5  comparing what we might see as some type of

6  injury to the vaginal area?

7  A.   The mucus membranes do tend to heal quicker

8  than keratinized epithelium or skin that you've

9  got, you know, on your arm or hands.  And seems

10  to -- unless you've got some special equipment or

11  something -- not show obvious scars.

12  Q.   So when you're doing that type of examination

13  on a child, how might your findings be affected

14  by how long it has been since the last incident

15  of reported abuse?  In other words, if the abuse

16  was yesterday versus a month ago.

17  A.   Well, in this instance, you know, time does

18  tend to heal wounds.  So whether it's, you know,

19  a laceration or abrasion or bruise, the passage

20  of time tends to take away your opportunity to

21  identify evidence.

22  Q.   Have studies been done and performed on how

23  long it takes vaginal tissue to heal?

24  A.   Yeah.  I think there have been some case

25  reports published where clinicians had

1    opportunity to know exactly when an injury

2    occurred and had documented it over time that it

3    can be just a matter of days.

4    Q.   And have those studies documented that after

5    a matter days it's completely healed and there's

6    no sign of that injury?

7    A.   Yes, I agree.

8            MR. WHITE, JUNIOR:  Your Honor, I

9    object.  First, on hearsay, no foundation.  I

10   don't know what study has been identified that he

11   bases his opinion upon.

12           THE COURT:  Overruled.

13   Q.   (BY MS. MCAMIS:) First of all, I want to ask

14   you about some specific studies.  Is one of the

15   studies that you're referencing by a

16   Dr. Robert --

17           MR. WHITE, JUNIOR:  Leading.

18           THE COURT:  Overruled, Counsel.

19   Q.   (BY MS. MCAMIS:) -- Dr. Robert Block, who was

20   the chief pediatrician for the American Academy

21   of Pediatrics?

22   A.   Yes.

23   Q.   I want to also ask you about studies that

24   have been conducted by Dr. Nancy Kellogg.

25        Are you familiar with those studies?

1   A.   I'm familiar with her work in terms of

2   documenting abnormalities versus normality of

3   genitalia in a population of young girls who were

4   pregnant.

5   Q.   With respect to those girls being pregnant,

6   why is that important in terms of the studies

7   that have been conducted?

8   A.   Well, you know, it was an attempt to

9   establish the reliability of an external exam and

10  checking whether a young girl had penetration of

11  her introitus.

12  Q.   And so if a girl has been -- is pregnant does

13  that indicate that there has been penetration?

14  A.   Yes.

15  Q.   And with respect to Dr. Kellogg, of those

16  over 2,000 sexual abuse examinations can you tell

17  us whether 96 percent of those were normal with

18  no findings?

19  A.   I think that's correct.

20  Q.   Is there an expression point for that, if you

21  will, "it's normal to be normal"?

22  A.   Yes.

23  Q.   Why is that significant to you as a

24  pediatrician?

25  A.   That you can't claim to be able to rule out

1    an injury just because the finding is normal.

2    Q.   Is it important for some of the girls that

3    you examine to reassure them that, in fact, they

4    are normal and it's normal to be normal?

5    A.   Sure.  Sure.  That's one of the two of a

6    handful of reasons to go to see a clinician is to

7    receive some comfort or some answers, so the

8    reassurance is a part of that.

9    Q.   I want to ask you specifically about your

10   care and treatment of BrieAnna Blackburn, now

11   Coker.  Did you see her as a patient at the OU

12   Health Science Center Pediatric Clinic on

13   September 12, 1996?

14   A.   I don't recall, but I've seen a document that

15   indicates that I did.

16   Q.   That's what I want ask about.  That was 24

17   years ago.

18       Do you have an independent recollection of

19   this particular examination?

20   A.   No.

21   Q.   At the time on September 12, 1996, was this

22   examination of BrieAnna documented in the medical

23   chart?

24   A.   Yes.

25   Q.   And have you had the opportunity to review

1    the medical chart from that day?

2    A.   I have, yes.

3    Q.   So when you're testifying are you saying

4    that's what you're testifying from and about,

5    your review of the medical documentation from

6    that day?

7    A.   Yes.

8    Q.   Can you tell us, and if you need to see it to

9    refresh your memory, just let me know, but can

10   you tell us what was the history, the chief

11   complaint, how and why were you seeing BrieAnna

12   as a patient that day?

13   A.   I think it might be best if I had it right in

14   front of me so I can look at because otherwise

15   I'm just based on my recall.

16           MS. MCAMIS:  I can get it.  Your Honor,

17   may I?

18           THE COURT:  You may.

19           MS. MCAMIS:  Thank you.

20           MR. WHITE, JUNIOR:  Judge, I have a copy

21   of it I would be happy to give.

22           THE COURT:  It looks like Ms. McAmis has

23   found it.

24           Thank you, counsel.

25           MS. MCAMIS:  May I approach, your Honor?

1          THE COURT:  You may.

2          MS. MCAMIS:  Again, and for the record,

3    it's Bates 413.

4    Q.  (BY MS. MCAMIS:) Is that, in fact, a copy of

5    the medical record from that day?

6    A.  Yes.

7    Q.  So can you tell us now on the medical record

8    is there a category for "chief complaint?"

9    A.  Yes.  "CC:" is chief complaint.  It says,

10   "Rule out sexual abuse."

11   Q.  Were you able to determine how old BrieAnna

12   was at the time?

13   A.  Yes.

14   Q.  How old?

15   A.  Four years.

16   Q.  Does the history that was obtained contain

17   information from both a parent and from Brie

18   herself?

19   A.  Yes.

20   Q.  How is it differentiated within the record?

21   A.  So it's written with quotes around the

22   statement that "Grandpa put his finger inside my

23   private parts," end quote and that's a convention

24   that we use for a direct quote.

25   Q.  In other words, that's directly what Brie

1  stated?

2  A.  Yes.

3  Q.  Okay.  Was that history that was obtained

4  from Brie for the purposes of medical diagnosis

5  and treatment?

6  A.  Yes.

7  Q.  What was the history that was obtained about

8  where Brie had been and when?

9  A.  It says that she had stayed with her

10  grandparents from August 8th through the 15th of

11  this year.

12  Q.  You told us that Brie made the statement,

13  "Grandpa put his finger inside my private part"

14  is there another statement with quotes that is

15  directly attributable to Brie?

16  A.  Yes.  It says quote, "Grandpa asked me to

17  touch his private parts with my hand" end quote

18  during the visit, or during the clinical visit

19  that was said.

20  Q.  Was history also obtained from BrieAnna's

21  mother about whether or not law enforcement or

22  the Department of Human Services were involved?

23  A.  Yes.  It is documented that the mother has

24  already reported the incident through DHS and law

25  enforcement.

1   Q.   And is it documented whether any counseling

2   had been sought?

3   A.   And it furthermore says that she has sought

4   counseling through Victory Christian Center.

5   Q.   Did the history also include who Brie was

6   living with at the time of the examination?

7   A.   Yes.  Under the social history it says that

8   she lives with her mother.

9   Q.   Does it indicate what type of relationship

10  she has with her mother?

11  A.   It says in quotes "close relationship," end

12  quote with Mom.

13  Q.   Was a physical examination done of Brie?

14  A.   Yes.

15  Q.   Can you tell us on the medical record are

16  there different portions of the physical exam

17  that were documented?

18  A.   Yes.

19  Q.   As we go through these different areas can

20  you explain to us what they mean?  The first

21  category is listed as "GEN"; is that correct?

22  A.   Yes.

23  Q.   Can you explain what that means?

24  A.   Yes, that's just a general observation that

25  begins as soon as you see the child in the room.

1    Typically, it's an opportunity to make some kind

2    of a statement about how appropriate the

3    encounter was and how the child was doing.

4    Q.   What findings were listed under that

5    category?

6    A.   It says that she was alert and she was

7    cooperative.

8    Q.   Is there also a space where it can be checked

9    whether it's normal?

10   A.   Yes.

11   Q.   Okay.  So it was normal; is that correct?

12   A.   Yes.   But furthermore under the comments

13   that are specified, you know, alert and

14   cooperative.

15   Q.   All right.  I want to ask about the next

16   category, which is designated as HEENT.  Is that

17   head, eyes, ears, nose, and throat?

18   A.   Yes.

19   Q.   Can you tell us how that was categorized?

20   A.   Yeah.  It was a check mark for normal and

21   then a column.

22   Q.   What areas of the ears were checked?

23   A.   She's done -- an otoscopic exam had been

24   performed in the TMs, or the tympanic membranes

25   or eardrums were clear, which is a normal

1    condition for them, and that the pharynx was

2    clear.

3    Q.   Does that mean her throat was clear?

4    A.   Yes.

5    Q.   The next category is neck; is that correct?

6    A.   Yes.

7    Q.   How was she categorized there?

8    A.   Just a normal check with no comments.

9    Q.   What about the next category, which is

10   designated as RESP.

11   A.   Respiratory exam.  Normal.

12   Q.   What did it say about her lungs?

13   A.   That her lungs were clear to auscultation.

14   Q.   Is that what the "CTA" stands for?

15   A.   Yes.

16   Q.   Then is the next category CVS, cardiovascular

17   system?

18   A.   Yes.

19   Q.   What is noted there?

20   A.   Check mark for normal.

21   Q.   What is noted about her heart?

22   A.   That she had a regular rate and rhythm.

23   Q.   So is the next category for an abdominal

24   exam?

25   A.   Yes.

1    Q.   What is noted there?

2    A.   Normal check.

3    Q.   What is noted about her bowel sounds?

4    A.   That they were detected or present positive.

5    Q.   And is that an indication of normal?

6    A.   Yes.

7    Q.   Thank you.  And tell us about the next

8    category.

9    A.   GU, genital urinary.

10   Q.   What does that stand for?

11   A.   Genital urinary.

12   Q.   Okay.  The genitals and the urinary system?

13   A.   Yes.

14   Q.   Is that categorized as normal?

15   A.   Yes.

16   Q.   Can you tell us what Tanner stage she was

17   indicated for?

18   A.   Tanner stage one.

19   Q.   What is the Tanner stage and what does Tanner

20   stage one indicate?

21   A.   That would be the very first stage that's

22   completely not influenced with any hormonal

23   development in terms of indicating a progression

24   into puberty, that would be appropriate for a

25   four year old.

1    Q.   In other words, she had not shown any signs

2    of puberty?

3    A.   Yes.

4    Q.   Can you tell us the additional indications

5    that you listed in that category?

6    A.   Additional information that's documented in

7    that category?

8    Q.   Correct.

9    A.   So there's a 0 or a null sign for tears or

10   lacerations.

11   Q.   How does it describe her hymenal opening?

12   A.   That it was oval with smooth, slightly rolled

13   borders, and no apparent scaring.

14   Q.   Was any discharge indicated?

15   A.   No.

16   Q.   Is the next portion of the examination

17   rectal?

18   A.   Yes.

19   Q.   How is that described?

20   A.   Normal.

21   Q.   What is the next portion of the examination

22   for EXT?

23   A.   Extremities, normal.

24   Q.   Okay.  And the next portion of the

25   examination for neuro.

1  A.   Yeah, neurological system, normal.

2  Q.   As part of Brie's examination was there any

3  forensic examination conducted or cultures taken

4  as would occur with an acute visit to a SANE

5  nurse, a sexual assault nurse examiner?

6  A.   No.  There was no cultures taken and the

7  examination was just restricted to the external

8  exam of the genitalia.

9  Q.   Why not?  Why not swab for semen, look for

10  hairs, the types of things that a SANE nurse

11  would do in an acute examination?

12  A.   Well, passage of time and then also there is

13  a team that specializes in doing that in a way

14  that minimizes the trauma to the child.

15  Q.   In that part of the document when does it

16  state that the sexual abuse allegedly occurred?

17  A.   Around a month prior to the encounter in the

18  clinic.

19  Q.   So if a month had passed since the last time

20  of sexual assault would it be appropriate to

21  perform an acute SANE nurse examination?

22  A.   Well, again, SANE nurses generally are not

23  involved in these exams with a four year old

24  anyway.  And I would say probably not.

25       Though with the information that's here, I

1    couldn't say that that wasn't in her future

2    anyway since it had been reported to DHS and to

3    law enforcement.

4    Q.   Was a plan documented for Brie?

5    A.   Yes.

6    Q.   What was that?

7    A.   It says that mother was to continue with

8    Department of Human Services and the sheriff's

9    investigation and to return to the clinic, RTC,

10   as needed, PRN.

11   Q.   What does that mean?

12   A.   That if she needed to come back, she was

13   welcome to come back for additional exam or

14   conversation.

15   Q.   Dr. Stewart, based upon your training and

16   experience in the field do you have a medical

17   opinion as to whether or not Brie's examination

18   was consistent with the history that was provided

19   that day?

20   A.   Yes.

21        MS. MCAMIS:  Thank you.  I have no

22   further questions.

23        THE COURT:  Cross-examination.

24        MR. WHITE, JUNIOR:  Thank you, your

25   Honor.

**CROSS-EXAMINATION**

**BY MR. WHITE, JUNIOR:**

Q.   Good afternoon, Doctor.

A.   Good afternoon.

Q.   I want to talk initially about your education background, and then move into some areas of the human anatomy and ultimately get to what we're here on.

My first question is what's the difference between a D.O. and M.D.?

A.   They're just two different degrees for physicians in this country; licensed in all 50 states.

Q.   Is there a difference in -- I'm sorry.

A.   Practice medicine, do surgery, both of them.

Q.   So why would one choose to go the D.O. route versus the M.D. route or vice-versa?  What's the theory behind that?

A.   There's a lot of reasons.  The osteopathic schools traditionally had produced a higher proportion of primary care physicians, family doctors, GPs, pediatricians, internists.

You know, it could boil down to in a state like Oklahoma if you would rather live in Tulsa than go to Oklahoma City.

1   Q.   Tulsa puts out D.O.s; Oklahoma City puts out

2   M.D.s?

3   A.   Yes.

4   Q.   All right.  And you mentioned D.O.s in the

5   D.O. field, D.O.s, maybe there are more primary

6   care physicians in the D.O. arena than in the

7   M.D. arena.  Did I hear that right?

8   A.   Yes.  I think that still may be even true

9   today.

10   Q.   Very good.  Because I see here on the

11   document, I don't want to get ahead of myself,

12   but speaking of D.O.s the primary care physician

13   for BrieAnna was Gibson, a Dr. Gibson.

14        Do you see that?

15   A.   Yes.

16   Q.   Do you know who Dr. Gibson was?

17   A.   Yes.

18   Q.   Who is Gibson?

19   A.   Gwendolyn Gibson was another pediatrician

20   that was practicing with me in the academic

21   pediatric group at OU Tulsa.

22   Q.   So you two were together back in '96 when you

23   did this exam?

24   A.   Yeah.  We were partners in the same practice

25   back in '96, yes.

1    Q.   We'll get to that.  You're not a

2    gynecologist?

3    A.   That's correct.

4    Q.   Now, your resume, you graduated from the

5    Oklahoma State University; true?

6    A.   Yes.

7    Q.   And then you went to Oklahoma State

8    University College of Osteopathic Medicine and

9    became a treating D.O.?

10   A.   Yes.

11   Q.   Medical doctor.  Not medical doctor.  Doctor

12   of Osteopathic Medicine?

13   A.   Yes.

14   Q.   And also you got a Master's in Public Health

15   from the University of Oklahoma Health Science

16   Center.

17   A.   Yes.

18   Q.   Tell us about that.  What does a Master's in

19   Public Health tell us?

20   A.   Well, so public health encompasses

21   epidemiology, health promotion, disease

22   prevention, health policy analysis, environmental

23   and occupational medicine, environmental

24   toxicology.  So people that want to specialize in

25   those areas would be expected to go back to

1    school and earn one of those degrees.

2    Q.   Like this pandemic that has us all dealing

3    with that issue and not wanting to get that, is

4    that part of your public health training,

5    studying how to deal with pandemics, prevent

6    pandemics, things like that?

7    A.   Yes, sir.

8    Q.   And is that one of your areas of interest?

9    A.   It is.

10   Q.   Very good.  And your post-doctoral training,

11   I understand you did a traditional internship at

12   the OSU Medical Center here in Tulsa, there in

13   Tulsa?

14   A.   Yes, sir.

15   Q.   Up the street there, turnpike.

16       And you also did a resident in pediatrics at

17   the OSU Medical Center?

18   A.   Yes, sir.

19   Q.   What is the difference for us non-medical

20   doctors, what's the distinction between an

21   internship and a residency?

22   A.   Well, it's rare to run into a rotating

23   internship anymore, but that's that first year

24   after you graduate from medical school where you

25   tend to be based in a hospital almost

 1   exclusively, and you're doing all of the, you

 2   know, basic work in a hospital in order to master

 3   the art of extracting an interview and doing

 4   exams and making orders and working with teams in

 5   a hospital.  So I rotated through all of the

 6   services for an entire year before I focused just

 7   on children.

 8   Q.   Because after you got your -- you completed

 9   your residency in pediatrics, you continued in

10   your training and licensure and certification,

11   you became a diplomat for the National Board of

12   Examiners for Osteopathic Physicians and

13   Surgeons.

14        Do you remember that?

15   A.   Well, that's just the licensing exam that I

16   passed.

17   Q.   And what does that qualify you to do?

18   A.   If you pass the three parts of that

19   particular exam, then you can submit that to a

20   state listening board for your credentials to get

21   a license.

22   Q.   And start practicing medicine?

23   A.   Yes.

24   Q.   And you also became board certified through

25   the American Osteopathic Board of Pediatrics;

1    true?

2    A.   Correct.

3    Q.   In order to take that certification, you've

4    got to take a test; don't you?

5    A.   A couple of them.

6    Q.   And you've got to retest to continue your

7    certification?

8    A.   That changed shortly thereafter so my

9    certification is a lifetime one, but a couple of

10   years after that they instituted a requirement to

11   retest every 10 years.

12   Q.   But because of your admittance in 1991, five

13   years before you saw BrieAnna, five years before

14   that you had become board certified?

15   A.   Yes, sir.

16   Q.   Now, notwithstanding that you also have

17   served -- you've served as a teacher, as a

18   professor; true?

19   A.   Yes, sir.

20   Q.   Both as an adjunct professor, an assistant

21   professor of pediatrics at the Tulsa campus, an

22   adjunct assistant professor of public health on

23   your master's degree, an associate professor of

24   pediatrics at the Tulsa campus, and you did that

25   from a '03 to '16; true?

```
 1   A.   Yes.
 2   Q.   And that's where you're teaching other people
 3   who want to become a pediatrician?
 4   A.   Well, the medical students have become
 5   neurosurgeons and internists, so I have taught
 6   medical students.
 7   Q.   Gynecologists?
 8   A.   Yes.
 9   Q.   Can a D.O. be a gynecologist?
10   A.   Yes.
11   Q.   Do you know D.O. gynecologists?
12   A.   I do.
13   Q.   Now, I know that currently you work for Blue
14   Cross and Blue Shield, but before we get to that
15   and I think that's where you say that you're the
16   Medical Director, Quality Metrics and Performance
17   for Blue Cross Blue Shield of Oklahoma?
18   A.   Yes, sir.
19   Q.   And you've been doing that as your full-time
20   job since 2016?
21   A.   Yes.
22   Q.   Now, I have here some publications that I was
23   very interested in because of you coming here to
24   share your thoughts with us on this case.
25        Have you ever published an article, a
```

1  publication, a journal, a book, a magazine, on

2  sexual abuse of children?

3  A.   No.

4  Q.   Same question for sexual examinations of

5  children who allegedly have been abused.

6       Have you written on any of that?

7  A.   No.

8  Q.   Like a protocol to go through to determine

9  whether that child, whether it's a -- regardless

10 of age up to 18, a protocol as to how to properly

11 examine a sexual abuse victim, have you ever

12 written on that?

13 A.   No.

14 Q.   But I understand that your testimony is such

15 that before you saw BrieAnna in '96, 1996 on

16 September 12th, that was not your first

17 examination of a child who allegedly had been

18 sexually abused; true?

19 A.   That's true.

20 Q.   On these other examinations before BrieAnna

21 in 1996, did you ever have occasion to send a

22 child who was the alleged victim of sexual abuse

23 for further examination in some way, shape, or

24 form following your examination?

25 A.   Yes.

1    Q.   Tell us about that.

2    A.   Well, the group that I belonged to included

3    some pediatricians who specialized in child abuse

4    and neglect, and so informally it would be a

5    fairly simple matter if there was another one of

6    those physicians right there in the clinic that

7    you could involve them.  It was a privilege that

8    we had that generally was not afforded to the

9    larger community because they wanted the

10   referrals into that special clinic to come

11   through DHS and law enforcement, but we did have

12   the ability to do that with our own clinic.

13   Q.   All right.  And what type of further

14   examinations are we talking about?

15   A.   Well, probably the -- an important one would

16   be the services of a trained forensic

17   interviewer.  The environment that they use is

18   less of a clinic and more like a home, the

19   ability to record interviews, special equipment

20   for photography and a colposcope, which is an

21   instrument that magnifies structures on external

22   exam.

23   Q.   I got three so far.  Maybe send them for a

24   forensic interview.  Yes?

25   A.   Yes.

1   Q.  Tell us what that is again, please.  What is
2   a forensic interview of a minor child who's the
3   alleged victim of a sexual assault?
4   A.  So you know it's somebody who takes great
5   care to do a developmentally appropriate
6   interview based on the age of the child, and to
7   spend the time to hear their whole story and to
8   take care to not ask leading questions.
9   Q.  To spend time not to ask leading questions.
10  Did I understand that right?
11  A.  Yes.
12  Q.  Is that important to not ask leading
13  questions of a minor child who allegedly is
14  coming to an interviewer, a professional forensic
15  interviewer, is it important not to ask those
16  leading questions?
17  A.  Yes.
18  Q.  Why?
19  A.  Well, so that you might be able to determine
20  the truth.  Children can be really
21  impressionable.
22  Q.  What do you mean by that?
23  A.  Well, I mean, they may want to, you know,
24  please an adult that's in the room or to please
25  the interviewer, if you're not careful.

1  Q.   Please the adult in the room.

2       Although, I'm probably going to be getting to

3  this whenever I want to talk about BrieAnna, but

4  what was Momma in the room the entire time that

5  you were with BrieAnna?

6  A.   Oh, I don't recall.

7  Q.   Would your examination note refresh your

8  memory as to whether she was in there the entire

9  time that you spent visiting with BrieAnna?

10 A.   No, it doesn't state that.

11 Q.   Do you know why it doesn't state that?

12 A.   You know, this is a fairly complete note that

13 would go beyond what I would expect in the

14 clinic.

15 Q.   If the patient was alone, if you were alone

16 with BrieAnna when you were taking a history, so

17 it's just you and this four year old that turned

18 four within the month, she turned four -- do you

19 know when she turned four?

20 A.   No.

21 Q.   August 13th of 1996.  You see her September

22 12th of '96.

23      Would you document in any way when you're

24 taking the history of a four year old who's in

25 the room?

1    A.   Yes.

2    Q.   All right.  Now, I want to get back to

3    your -- your training.  You have -- you have

4    done -- this is not the first time that you've

5    testified; is it?

6    A.   This is not the first time I've testified.

7    Q.   You testified in various courtrooms through

8    the years concerning criminal cases; true?

9    A.   Yes, sir.

10   Q.   Now, are you still a treating doctor?

11   A.   No.

12   Q.   In 2016 when you took the job with Blue Cross

13   Blue Shield, that job took you out of being a

14   classic Marcus Welby doctor like I watched on TV?

15   A.   Yes.

16   Q.   All right.  All right.  Now, as

17   your employment with this Blue Cross Blue Shield

18   are you involved with health claims that come in

19   from people seeking reimbursement for medical

20   expenses?

21   A.   Yes, to a degree.

22   Q.   Explain to us how you assist Blue Cross Blue

23   Shield, the insurer for a bunch of people, myself

24   included, with the claims process?

25   A.   I have a small role in helping decide where

1  appeals go in terms of sending them outside for

2  an external specialty management, and I review

3  those reports when they come back and will follow

4  the recommendations about whether to uphold a

5  prior decision or to overturn it and approve a

6  claim.

7       I have a small role also in working with the

8  team that investigates fraud, waste and abuse

9  that involve claims.

10 Q.   In what way?  Fraud, waste, and abuse of

11 claims from the practitioner, the

12 medical provider --

13 A.   Yes.

14 Q.   Overcharging or doing treatment that's

15 unnecessary?

16 A.   Yes.

17 Q.   All right.  Okay.

18      Now, let's see.  This document that we have

19 here--I've got four copies of it--is that the

20 only medical record you have of anything you did

21 as it relates to BrieAnna?

22 A.   Yes, this is the only page that I have.

23           (Item marked Defendant's Exhibit No. 14.)

24           MR. WHITE, JUNIOR:  I want to move the

25 admission of Defendant's Exhibit 14, page one Bate

1    Stamp 413, the medical record in front of

2    Dr. Stewart.

3            THE COURT:  Any objection?

4            MS. MCAMIS:  No objection, your Honor.

5            THE COURT:  It will be admitted.

6    Q.   (BY MR. WHITE, JUNIOR:) Now, in terms of --

7    let's just get to it.

8        Can I use this, Mr. Davis?

9        Can you see that?

10   A.   Yes, sir.

11   Q.   Does that appear to be the same document that

12   you've got in front of you?

13   A.   Yes, sir.

14   Q.   Let me just watch -- I'll -- what you have in

15   front of you, we have it up here on the screen.

16   A.   Yes, sir.

17   Q.   All right.  Now, first, this is a medical

18   record from the OU Health Science Center-T.  I

19   guess that's for "Tulsa"?

20   A.   Yes, sir.

21   Q.   Pediatric Clinic; right?

22   A.   Yes, sir.

23   Q.   And so is this your clinic that you work in?

24   A.   Yes, I was working there at the time.

25   Q.   And then we see over here Medicaid PCP,

1  primary care physician?

2  A.   Yes.

3  Q.   Gibson?

4  A.   Yes, sir.

5  Q.   Do you know if Dr. Gibson -- but before I ask

6  that, before I ask that, do you remember how

7  BrieAnna came to you?

8  A.   No.

9  Q.   If we didn't have this record in front of us

10  today, would you be at a loss as to what you did

11  on September 12, 1996, concerning this

12  examination?

13  A.   Yes.

14  Q.   All right.  And so whatever is on this paper

15  is going to be what you did?

16  A.   Yes.

17  Q.   Best you can tell?

18  A.   Yes.

19  Q.   All right.  And so there's nothing today that

20  you would like to try and amend, change, qualify,

21  modify on this document because you don't

22  remember it?

23  A.   No.

24  Q.   Do you agree?

25  A.   Yes.

1   Q.  Do you know if Gibson -- is Gibson a man or a

2   woman?

3   A.  It's a female.

4   Q.  Female.  And what's her first name?

5   A.  Gwendolyn.

6   Q.  You said that.  I apologize.

7       Dr. Gibson, do you know if Dr. Gibson

8   participated in this examination with you?

9   A.  There's nothing in the document to suggest

10  that she did.

11  Q.  Do you know if Dr. Gibson visited with you

12  before or after your examination of her primary

13  care patient?

14  A.  I do not recall.

15  Q.  Very good.  We see on September 12th of '96,

16  you saw her in the morning time?

17  A.  Yes.

18  Q.  Her age is four years old and her weight is

19  25.8 pounds; is that right?

20  A.  I think we generally recorded the weight in

21  kilos.

22  Q.  Kilos.  How much would kilos be in pounds?

23  A.  It would be between 50 and 60 pounds.

24  Q.  And she -- and we'll get to this, but

25  everything was good with her in terms of her

1   weight, and in terms of her appearance, in terms

2   of her affect; right?

3   A.   Yes.

4   Q.   What is "affect"?

5   A.   Your -- I mean, some people would call it the

6   "mood."  But externally it would be your response

7   to your environment and to other people.

8   Q.   Okay.  Now, if Momma came in do you know the

9   name of BrieAnna's mom?

10  A.   No, I do not.

11  Q.   De Ette.  If De Ette came in to this

12  courtroom today, do you think you could recognize

13  her and say that BrieAnna's mom?

14  A.   No.

15  Q.   Okay.  Now, CC: RO sexual abuse.  What does

16  that -- rule out sexual abuse; is that right?

17  A.   Yes.

18  Q.   Or report of sexual abuse.  Which is it?

19  A.   Rule out.

20  Q.   And what does "CC" stand for?

21  A.   Chief complaint.

22  Q.   Chief complaint:  Rule out sexual abuse.

23       So "rule out," does that mean rule out that

24  sexual abuse didn't happen, does that mean rule

25  out sexual abuse did happen?  What?

1    A.   That is generally reported by the nurse or

2    nurse assistant that put the child and the parent

3    in a room, and so that would be their

4    understanding of what the reason for the visit

5    was.

6    Q.   Child and parent are in a room together; a

7    nurse goes in and do you know who was doing the

8    talking when "sexual abuse" came up?  Momma or

9    the four year old?

10   A.   Are you talking about when they first roomed

11   them or when the first clinician went in there?

12   Q.   I'm talking about when they came in to the OU

13   Health Science Center Pediatric Care Clinic and

14   they checked in.

15        Do you know what their check-in was:  Did

16   they check-in because my baby girl doesn't feel

17   good, or are we checking in because I think she's

18   been abused, I'm telling you that she's been

19   abused?

20        Do you know what was said there by Momma?

21   A.   I don't have any record of documenting what

22   was said when she checked in.

23   Q.   So who made the determination CC: Rule out

24   sexual abuse?  The nurse or you?

25   A.   The nurse would tend to write that once they

1    retrieve the patient and parent from the waiting

2    room, brought them back to the room and started

3    the record.

4    Q.   How long were Momma and baby girl in that

5    waiting room with the nurse?

6    A.   Doesn't stay.

7    Q.   How long were they alone in the room together

8    waiting on someone to get in the room with them?

9    A.   There's nothing documented about that.

10   Q.   Give us your best estimate.  Five minutes?

11   10 minutes?  30 minutes?  How long?

12   A.   Well, I mean, I could go back and maybe

13   average my experience over 23 years or so, and

14   say maybe 10 minutes.

15   Q.   Ten minutes.  But nothing's recorded in that

16   room like it would be in a forensic interview

17   where Mom's not in the room.  It's just the child

18   and the interviewer; right?

19   A.   Yes, certainly no recording.

20   Q.   No recording.  Do you think the nurse got the

21   sexual abuse from the child or the mother; do you

22   know?

23   A.   Don't know.

24   Q.   Interesting question; agree?

25   A.   Yes.

1   Q.   Do you know what De Ette's relationship was

2   with Mr. McGirt as you sit here today?

3   A.   No.

4   Q.   Do you know what De Ette testified to under

5   oath about what her relationship was?

6   A.   No.

7   Q.   Or what Norma, Norma Blackburn?  Do you know

8   who Norma Blackburn is?

9   A.   I think I met her.

10   Q.   Grandma, grandma to BrieAnna?

11   A.   An older lady named Norma I met today.

12   Q.   Do you know what Ms. Blackburn has testified

13   to regarding De Ette?

14   A.   No.

15   Q.   HPI.  What does "HPI" stand for?

16   A.   History of the present illness.

17   Q.   Now, you have here -- but before we get to

18   that, they go from -- Momma and BrieAnna, do they

19   go to a different room after having met with the

20   nurse?  Are they changed into a different room or

21   do you go into the room they're in?

22   A.   Typically they would be left in the room

23   after a short wait and the clinician would go in

24   there next.

25   Q.   Okay.  Now, do you know if the nurse was in

1   the room when you went in there?

2   A.   No.

3   Q.   Do you know if the nurse left you any notes

4   about -- you're about to walk into a room where

5   Mom's saying her daughter is sexually abused.

6        Do you have anything like that in your file

7   that gave you a head's up as to what you were

8   about to be confronted with?

9   A.   No.

10  Q.   And when you go into a room with a patient,

11  do you have your stethoscope?

12  A.   Typically, yes.

13  Q.   You don't have a colposcope?

14  A.   No.

15  Q.   And a colposcope would allow you -- have you

16  ever used a colposcope?

17  A.   No.

18  Q.   That's for gynecologists; correct?

19  A.   Typically, yes.

20  Q.   But a colposcope could literary, could

21  literally see a pinpoint abrasion on a posterior

22  fourchette, the vulva, what have you.  A

23  colposcope could help you in determining that

24  through a sexual assault examination; true?

25  A.   It certainly provides magnification beyond

1    what you can see with the naked eye.

2    Q.   Do you know how much of a magnification a

3    colposcope could help us with on a sexual, a

4    purported sexual assault examination of BrieAnna

5    at four years old?

6    A.   No.

7    Q.   But you didn't see any need for that when you

8    saw BrieAnna on September 12th; true?

9    A.   Yes.

10   Q.   You agree with me?

11   A.   I agree with you.

12   Q.   Now, I want to backup just a minute before we

13   get into this history.  You don't know any of the

14   family dynamics going on in September of '96 with

15   the Blackburn family, Mr. McGirt, Mrs. McGirt.

16        You don't know any of that; true?

17   A.   That's true.

18   Q.   All right.  Now, what you're told is patient

19   is a four year old, and then there's this little

20   stick person I see.  Do you see that?

21   A.   Yes.

22   Q.   What does that "patient is a four year old

23   with a little stick person" is all of that your

24   handwriting?

25   A.   No.

1   Q.   Whose handwriting is that?

2   A.   That's a pediatric resident that I was

3   supervising in the clinic.

4   Q.   Who was that pediatric resident that was in

5   there?

6   A.   Angela Fangmeier.

7   Q.   Can you spell that?

8   A.   F-A-N-G-M-E-I-E-R.

9   Q.   Thank you very much for that.

10       And so she was a resident?

11  A.   Yes.

12  Q.   And was she a resident with a focus in

13  pediatrics?

14  A.   Yes.

15  Q.   And were you her supervisor?

16  A.   For that morning I was.

17  Q.   Do you know how many times your resident that

18  was there -- say that last name again, please.

19  I'm sorry.

20  A.   Fangmeier.

21  Q.   "Fang" like fangs?

22  A.   Yes.

23  Q.   Dr. Fangmeier -- was she a doctor yet?  Is

24  appropriate for me to call her Dr. Fangmeier?

25  A.   Yes.

1    Q.   All right.  Did Dr. Fangmeier do the talking

2    between patient BrieAnna and Fangmeier or were

3    you doing the talking?

4    A.   I don't recall.

5    Q.   Do you recall if Dr. Fangmeier was asking any

6    questions?

7    A.   I don't recall.  She certainly did the

8    documentation.

9    Q.   Okay.  So is all of this her handwriting?

10   A.   Not all of it.

11   Q.   I've got -- the reason I ask that, that looks

12   a little different on "RO sexual abuse;" right?

13   Than this writing; right?

14   A.   That's correct.

15   Q.   Do you know if maybe that "RO sexual abuse"

16   came from the nurse that met with Momma and

17   daughter before you and your resident ever came

18   in?

19   A.   That would be the typical convention.

20   Q.   Very good.  What's the purpose of showing the

21   little stick person?  "Patient is a four year

22   old" and there's a little head with a T.

23   A.   We're always looking for abbreviations and

24   shortcuts, so that's the symbol for female, and a

25   male would be a circle with an arrow.

1    Q.   Got it.  And "who stayed with grandparents
2    August 8 through the 15th of this year."  Do you
3    see that?
4    A.   Yes.
5    Q.   Now, Dr. Fangmeier quotes BrieAnna.
6         Do you see that?
7    A.   Yes.
8    Q.   Now, one of the allegations in this case is
9    that there was -- that there was a tongue going
10   inside of BrieAnna.  Were you aware of that?
11   A.   No.
12   Q.   That's one of the purported sexual assaults
13   by McGirt, that a tongue allegedly was used.
14        Is today the first day you've known that?
15   A.   That's the first time I've heard that.
16   Q.   Yeah, all right.
17        Now, "Grandpa put his finger inside my
18   private parts" that's coming from a four-year-old
19   girl that says, "private parts."
20        Do you see that?
21   A.   Yes.
22   Q.   Now, first you didn't know Mr. McGirt in
23   September of 2000 -- in September of '96; did
24   you?
25   A.   That's true.

1   Q.   You didn't know whether he had little bitty

2   hands or bigger hands of a man, a working man, a

3   guy that works with his hands.  You didn't know

4   what hand he possessed; true?

5   A.   That's true.

6   Q.   Well, what I'm wondering is sometime

7   allegedly between August 8th and August 15th of

8   this year, within a month, patient states,

9   "Grandpa put his finger inside my private parts."

10       Do you see that?

11  A.   I do.

12  Q.   Now, did you all ever find out whether it

13  really was a finger, was it a thumb, what was

14  Momma saying?

15  A.   Don't have any documentation to elaborate

16  beyond that.

17  Q.   Because an embryo, a female embryo, during

18  embryosis is developing body parts; true?

19  A.   True.

20  Q.   And the vagina of an embryosis, as they're

21  developing, it is actually a smoothed over

22  vagina; right?

23  A.   I believe that's right.

24  Q.   And take us through the embryonic stages up

25  to a little baby.  I got three baby girls, not

1  babies anymore, and two boys, the five of them

2  are.

3       Take us through the embryonic stages of how a

4  vagina develops in Momma's body as the baby is

5  coming to the world.

6  A.   I'm not prepared to do that and be a hundred

7  percent assured that I get it completely

8  accurate.

9  Q.   Okay.  But at some point that baby, female

10  baby, is born with a hymen; right?

11  A.   Most of the time.  In many instances, yes.

12  Q.   Yes.  And there's a point where the hymen --

13  the hymen is at the entrance; right?

14  A.   Yes.

15  Q.   It's like at the very front of the vaginal

16  canal, the vaginal opening; right?

17  A.   Yes.

18  Q.   Yeah.  And that hymen on a three year old or

19  four year old -- well, before I ask that

20  question.

21       Estrogen.  What is estrogen to a female?

22  A.   Well, it's a hormone that influences many

23  organs including the genitals.

24  Q.   Yes.  And estrogen to a hymen allows for

25  elasticity; true?

1    A.   I think that's true.

2    Q.   Yeah.  And a four year old is not going to

3    have estrogen; right?

4    A.   Yeah, not that I know of.

5    Q.   No.  And so if a baby girl that is three or

6    four years old has that hymen right there in the

7    front with no estrogen in her body, can you and I

8    agree that that hymen is going to be rigid, not

9    elastic, not forgiving; true?

10   A.   No.  I mean, some girls don't have much of a

11   hymen.  Sometimes it's just a tag from the very

12   beginning and so there's a lot of variation in

13   it.

14   Q.   Well, she had a hymen, BrieAnna, according to

15   your note; right?

16   A.   Yeah.

17   Q.   Because what I'm wondering, I'm going back to

18   this time frame, see, August 8th to August 15th,

19   1996, you're told or Dr. Fangmeier is told or

20   your nurse is told, that there is a purported

21   sexual assault where Mr. McGirt "stuck his finger

22   inside my private parts," that's what the girl

23   says; right?

24   A.   Yes.

25   Q.   And you don't know whether -- if Momma was in

1   the room, do you know how close Momma was?

2   A.   I don't know.

3   Q.   And do you know, I think I heard you testify

4   on direct examination that, or maybe it was on

5   cross, that there is a need to please with

6   children and their parents when they're saying

7   something.

8        Do you remember that?

9   A.   That would be fairly common in certain ages.

10  Q.   What ages?  Four?

11  A.   Preschoolers, yes.

12  Q.   Yes, yes.  Need to please; right?

13  A.   Yes.

14  Q.   Now, what we're getting to here is so let's

15  say that hypothetically speaking, of course, on

16  August 10th, this three year old about to turn

17  four, Doctor, has a finger or a thumb pushed

18  inside her.  Wouldn't that necessarily be

19  painful?

20  A.   I would think that could be painful.

21  Q.   On a scale of 1 to 10, 10 being death-defying

22  pain, one being I don't even really feel it,

23  where would you put that in your medical opinion?

24       A finger allegedly going inside the vagina of

25  a three year old by a grown man, with hands, what

1    would that do?
2         What kind of pain are we talking about?
3    Would she scream?  Would she cry?  Would she curl
4    up?
5         What the heck would you expect to be going on
6    if, in fact, that happened?
7    A.   The way that you described it sounds like it
8    would be painful.
9    Q.   Well, I'm asking you.  I'm just a lawyer.
10   You're the expert doctor.
11        What do you think?  Three year old about to
12   be four with an adult finger going inside the
13   vagina.  No estrogen, non-elastic, no elasticity
14   to the hymen more probable than not, that would
15   have to be a painful experience; wouldn't you
16   agree?
17   A.   I think it would be uncomfortable.
18   Q.   More than uncomfortable; true?
19   A.   I think it would be uncomfortable, painful,
20   but whatever you want to call it.
21   Q.   I want to know the truth.  Would you say it's
22   painful?
23   A.   I don't know --
24            MS. MCAMIS:  I'm going to object.
25            THE WITNESS:  -- I don't have a vagina.

*UNITED STATES DISTRICT COURT*

1          THE COURT:  Sustained.

2     Q.   (BY MR. WHITE, JUNIOR:) Now, would there be

3     blood.  Would there be blood?

4     A.   That would be a possibility.

5     Q.   Do you know if anybody has ever seen any

6     blood -- first, do you know if this BrieAnna wore

7     panties?

8          THE COURT:  Mr. White, would you please

9     return to the microphone?

10          MR. WHITE, JUNIOR:  I'm sorry.

11          THE COURT:  Every time you get away it's

12     difficult to hear, so please try to stay at the

13     microphone.

14          MR. WHITE, JUNIOR:  I will.  Thank you,

15     your Honor.

16          THE COURT:  Thank you.

17     Q.   (BY MR. WHITE, JUNIOR:) Do you know if she

18     wore panties?

19     A.   Nothing about that's documented here.

20     Q.   Good question.  Where's the blood?

21          MS. MCAMIS:  I'm sorry.  Is there a

22     question, your Honor?  Is he just making

23     statements?

24          MR. WHITE, JUNIOR:  I'm asking where is

25     the blood if it -- where is the blood?

1           MS. MCAMIS:  I raise the same objection,

2     your Honor.

3           MR. WHITE, JUNIOR:  I'll rephrase it.

4           THE COURT:  Please do.

5     Q.   (BY MR. WHITE, JUNIOR:) Did anyone ask, Have

6     you seen any evidence of blood from this

7     four-year-old girl?

8        Did anybody ask that when that accusation was

9     made?

10    A.   Well, it's not documented in this medical

11    record.

12    Q.   So you don't know?

13    A.   Correct.

14    Q.   "And Grandpa asked me to touch his private

15    part with my hand."  Do you see that?

16    A.   Yes.

17    Q.   Well, did she touch it or not, allegedly?

18    A.   We were just capturing what was reported to

19    us in terms of the history.

20    Q.   Did anybody say to Momma or to BrieAnna, did

21    she really actually touch a grown man's penis?

22    Did anybody ask that question if you know?

23    A.   No, not in our clinic.

24    Q.   Now, did Mother tell you what she reported to

25    DHS and law enforcement?

1    A.   It's not documented.

2    Q.   Did Mom tell you what, if anything, Victory

3    Christian Center counseled Mom and daughter on,

4    if anything?

5    A.   Those details are not documented.

6    Q.   Have you seen those counseling records?

7    A.   No.

8    Q.   Then PMH under -- by the way, is there

9    anything else we need to add to the HPI portion

10   of this document that you think might be missing?

11   A.   This is a pretty good note from a good

12   resident.

13   Q.   All right.  Anything we need to add to

14   "PMH:"?

15   A.   There's always something that you could put

16   but there was probably not a need.

17   Q.   What does "PMH" stand for?

18   A.   Past medical history.

19   Q.   FH.  What's "FH"?

20   A.   Family history.

21   Q.   Nothing; right?

22   A.   Correct.

23   Q.   Do you recall if De Ette ever told you

24   anything about family history?

25   A.   No.

1    Q.   And then SH.  What's "SH"?

2    A.   Social history.

3    Q.   And what does that mean?  The social history

4    of the child?

5    A.   Yeah.  Where they live, who takes care of

6    them, where they go to school.

7    Q.   And quote, "close relationship" closed quote

8    with Mom.  Do you see that?

9    A.   Yes.

10   Q.   Did that come from the four year old or did

11   that come from the mother, De Ette?

12   A.   I don't know for certain.

13   Q.   All normal?

14   A.   Pardon me?

15   Q.   All normal?

16   A.   Yes.

17            MR. WHITE, JUNIOR:  Thank you, Doctor.

18            THE COURT:  Redirect.

19            MS. MCAMIS:  May I proceed, your Honor?

20            THE COURT:  You may.

21                    **REDIRECT EXAMINATION**

22   **BY MS. MCAMIS:**

23   Q.   Dr. Stewart, I want to go over some of the

24   things that were asked of you.

25        First of all, you were asked about things

1    like embryosis of the vagina.

2         Do you remember that?

3    A.   Yes.

4    Q.   Is there a particular field and speciality

5    that concerns the development of embryos in the

6    womb, OBGYN?

7    A.   Yes, and prenatal medicine would be involved

8    with that, clinical genetics.

9    Q.   Does how the vagina develops in an embryo in

10   the womb have anything at all to do with your

11   examination of a four year old who has been

12   sexually abused?

13   A.   No.

14   Q.   Counsel asked about how girls are born with a

15   hymen and whether they're rigid or whether

16   they're elastic.

17        Do you remember those questions?

18   A.   Yes, I do.

19   Q.   Dr. Stewart, I asked you on direct

20   examination do people have a lot of

21   misconceptions about hymens.

22             MR. WHITE, JUNIOR:  Objection; leading.

23             THE COURT:  Overruled.

24             THE WITNESS:  Yes.

25   Q.   (BY MS. MCAMIS:) And is that one of the

1  things exactly what you were talking about?

2  A.  Yes.

3  Q.  I'm going to use some of the terminology that

4  counsel used.  He said if a finger or a thumb was

5  jack-pushed inside of her would that be painful?

6      Do you remember him saying that?

7  A.  Yes.

8  Q.  In your 30 years of experience as a

9  pediatrician seeing thousands of pediatric

10  patients are you familiar with the sexual abuse

11  of children?

12  A.  Yes.

13  Q.  Can you tell us, Dr. Stewart, whether or not

14  it is common for sexual predators of children to

15  jack-push their finger inside or do they groom

16  their children?

17  A.  Well, I understand that it's more common to

18  groom them.

19  Q.  Is it common for sexual predators to put just

20  the tip or just touch or just rub?

21  A.  I think that's fairly common.

22  Q.  If, in fact, a little girl tells you that she

23  has been sexually abused, do you demand to see

24  blood in the panties and if you don't she hasn't

25  been?

1    A.   I do not tend to ask about viewing the

2    panties.

3    Q.   In your experience for 30 years in the field

4    of pediatrics, have you seen patients who have,

5    in fact, suffered years of sexual abuse?

6    A.   I think I have.  Though, you know, it's -- I

7    don't always receive the feedback from every

8    child that I've examined.

9    Q.   Do they all scream and cry and curl up when

10   they are being perpetrated upon?

11   A.   Oh, I don't know.

12   Q.   If they don't scream and cry and curl up in

13   pain does that mean that it didn't happen to

14   them?

15   A.   I wouldn't think that would be a requirement.

16   Q.   Counsel asked you about whether there was any

17   statement by Brie that day that she had been

18   penetrated with a tongue.

19        Do you remember that?

20   A.   I remember being asked about that, yes.

21   Q.   In your 30 years as a pediatrician is it true

22   that children disclose in stages?

23              MR. WHITE, JUNIOR:  Leading, your Honor.

24              THE COURT:  Sustained.

25              THE WITNESS:  Yes.

```
 1              THE COURT:  It's sustained.
 2              Doctor, wait for your next question,
 3    please.
 4              THE WITNESS:  Oh, I'm sorry.
 5              THE COURT:  That's all right.  Thank
 6    you.
 7              THE WITNESS:  I don't understand the
 8    terminology.
 9              THE COURT:  That's understandable.
10    Q.  (BY MS. MCAMIS:) Dr. Stewart, let me ask you,
11    when you speak with a pediatric patient do you
12    expect her to tell you everything that happened
13    exactly at that moment?
14    A.  I do not.
15    Q.  What does it mean for a child to disclose in
16    stages?
17    A.  Again, as they again develop some trust and
18    more comfort with the situation over time
19    incrementally, they will tend to disclose more.
20    Q.  And so would it be common in your training
21    and experience if a little girl starts off
22    telling one part of it to her mom and then later
23    tells another part and then later tells another
24    part?
25    A.  Yes, that would be consistent with my
```

*UNITED STATES DISTRICT COURT*

94

1   experience.

2   Q.   Counsel asked you about Dr. Fangmeier.   Do

3   you recall that?

4   A.   Yes.

5   Q.   And he asked you about her being a resident,

6   whether he could call her a doctor.

7        To be clear, the facility that you were

8   working at the time, the OU Health Sciences

9   Center Pediatric Clinic, is a teaching facility

10   to train pediatric residents; correct?

11   A.   That's correct.

12   Q.   Counsel asked you about how do you know how

13   much time Dr. Fangmeier spoke or how long they

14   were in there or what Dr. Fangmeier said to Brie.

15        Let me ask you this, Doctor:   If -- he asked

16   about leading questions and if you ever heard

17   your pediatric resident, your nurse or otherwise

18   ask a leading question, like isn't it true he put

19   his fingers inside of you, you would stop that.

20   You would document that.   You would make sure

21   that leading questions weren't being asked; is

22   that correct?

23   A.   That is correct.   That would be a teaching

24   moment for sure.

25   Q.   Counsel asked you if it was the Momma, he

1    kept calling her, who came in to talk about her

2    daughter being sexually abused.

3        First of all, if a mother becomes aware that

4    her child has been sexually abused is there

5    anything inappropriate whatsoever with the mother

6    taking her child to the doctor to be checked out?

7    A.   No.

8    Q.   If a mother comes in and says my child has

9    been complaining of a sore throat and then the

10   child says my throat hurts is there anything

11   inappropriate about that?

12   A.   No.

13   Q.   If you were in the room and counsel was

14   asking you if you knew anything about the family

15   dynamics or any of that information, if you were

16   in the room and you saw a mother who was somehow

17   inappropriately influencing her child, tell the

18   doctor what he did, tell him what I told you to

19   say, say this, say that, would you document that?

20   A.   Yes, I would.

21   Q.   In this record is there anything to suggest

22   that there was anything inappropriate going on?

23   A.   No.

24   Q.   Counsel also asked you about forensic

25   interviews and you talked a little bit about the

1    physicians who specialize in child abuse and

2    neglect.

3        Do you recall that?

4    A.  Yes.

5    Q.  And, Doctor, do those physicians work through

6    the Justice Center, the Children's Advocacy

7    Center in Tulsa?

8    A.  Yes.

9    Q.  Do they also do -- not the doctors but there

10    are forensic interviews that take place at the

11    Children Advocacy Center; is that correct?

12    A.  Yes, that's correct.

13    Q.  Dr. Stewart, in your 30 years of pediatrics

14    have you unfortunately found that sometimes

15    children in a larger community have access to

16    those services that children in a smaller

17    community do not?

18          MR. WHITE, JUNIOR:  Leading.

19          THE COURT:  Sustained.  Rephrase,

20    counsel.

21    Q.  (BY MS. MCAMIS:) Doctor, is there any

22    difference that you have seen in your practice

23    about children who come from a larger community

24    versus children who come from a smaller

25    community?

1    A.   There are differences, yes.

2    Q.   If, in fact, the child is not taken for a

3    forensic interview, is that her fault?  Is that

4    her choice?

5    A.   I don't know.  There are a lot of factors

6    that come into play in terms of the work of the

7    DHS investigators, the local law enforcement.

8    It's a bewildering and complicated system.

9    Q.   Sure.  It's not up to the four year old what

10   happens.

11   A.   No.

12   Q.   And if those processes were not put in place

13   in 1996, does that just mean we say never mind?

14   A.   No.

15   Q.   Finally, Doctor, counsel asked you several

16   questions about gynecological examinations.

17        Would it ever be appropriate for a four year

18   old prepubescent girl to be submitted to a

19   gynecological examination?

20   A.   The exam that we did would be generally

21   sufficient.

22   Q.   And counsel started off his examination by

23   distinguishing between a doctor D.O., and an M.D.

24   doctor.

25        First of all, I want to ask those

1  pediatricians who specialize in child abuse and

2  neglect at the Justice Center they're all D.O.s;

3  correct?

4  A.  Yes.

5  Q.  Are you in any way less qualified to take

6  care of the thousands of children you have taken

7  care of in 30 years?

8  A.  No.

9         MS. MCAMIS:  Thank you, sir.  I have no

10 further questions.

11         THE COURT:  Mr. White, do you have

12 recross?

13         MR. WHITE, JUNIOR:  Brief.

14         THE COURT:  Okay.  Please proceed.

15                **CROSS-EXAMINATION**

16 **BY MR. WHITE, JUNIOR:**

17 Q.  Did your facility have a forensic

18 interviewer?

19 A.  The pediatric clinic that I was in, no.

20 Q.  Now does the OU Health Science Center in

21 Tulsa have a forensic interviewer?

22 A.  Yes.

23 Q.  And is it in the same building as what you're

24 in?

25 A.  No.

Q.   Where -- how close is it to you?

A.   Back in 1996 it was maybe, you know, 20 yards away from the clinic.

Q.   All right.  Any reason why you did not recommend that BrieAnna participate in a forensic interview?

A.   Well, yeah.  Typically if DHS and law enforcement had already started an investigation, that ball was already rolling.

Q.   Do you know if she ever was forensically interviewed?

A.   I do not.

Q.   Do you know if she was sexually abused?

A.   I could not rule it out; I could not rule it in.

Q.   You don't know?

A.   Don't know.

Q.   By the way that document we went over, you're not the one that prepared that document.  It was Dr. Fangmeier?

A.   Correct.  I signed the bottom after I had reviewed the content back in 1996.

Q.   And you agreed with it?

A.   I did, yeah.  So I had the ability to amend it if I disagreed with it.  She was a very good

1    pediatric resident, very competent in

2    documenting, so I agreed with it.  That's the

3    bare minimum that you would write.

4    Q.   Thank you, Doctor.

5    A.   You're welcome.

6         THE COURT:  Ms. McAmis, can this witness

7    be excused?

8         MS. MCAMIS:  Yes, your Honor.

9         THE COURT:  Mr. White, can this witness

10   be excused?

11        MR. WHITE, JUNIOR:  Certainly, your

12   Honor.

13        THE COURT:  All right.  Very good.

14        Dr. Stewart, you may be excused.

15        Ladies and gentlemen, we're going to

16   conclude for the day.  I appreciate your time and

17   attention.  Please, report back tomorrow morning

18   at 9:00.  I would like you to report back to the

19   court clerk's office in Room 208.  You will be

20   directed to your respective break rooms.  Seven

21   of you will be directed to one break room for

22   distancing and the other seven will be directed

23   to another break room.  It's very important once

24   you reach your break room, please do not leave

25   that room.  You should have bathrooms in there,

 1    so you won't have a need to leave the break room.

 2    We'll call for you when ready.

 3            It's very important that during this

 4    recess over the evening, as well as any other

 5    recess, that you do not discuss this case with

 6    anyone, that includes your fellow jurors, your

 7    family members, your friends, anybody involved in

 8    this trial or anyone else.  If anyone tries to

 9    talk with you about this case, you must report it

10    to me immediately.

11            Do not read, do not listen to any news

12    reports, do not watch anything on TV or anything

13    of the sort about this case.  If you're listening

14    to the radio and something comes on about the

15    case, you must turn it off.  That's your

16    obligation.  Do not make any personal independent

17    investigation regarding this case whatsoever.

18            Finally, keep in mind that you must keep

19    an open mind in this case until all of the

20    evidence has been received, you have heard from

21    all of the witnesses, you have heard all of the

22    evidence, and you have received the instructions

23    from this court as to the law.

24            Thank you very much for your time and

25    attention.  We'll be in recess.

1           (The jury having been dismissed at

2      5:21 p.m., the following transpired:)

3           THE COURT:  Let's go on the record real

4      quick.

5           Counsel, do we have anything to discuss

6      this evening outside the presence of the jury?

7           MS. MCAMIS:  Your Honor, I do have an

8      issue that I apologize for bringing to your

9      attention.  I don't know whether you would prefer

10     to deal with it this evening or in the morning,

11     if I may briefly explain.

12          THE COURT:  Sure.  Go ahead.

13          MS. MCAMIS:  I had been having email

14     conversations with Mr. O'Carroll about the fact

15     that in this case, the United States Supreme

16     Court made a finding that the defendant was, in

17     fact, Native American and was, in fact, was

18     committed on -- this was committed on land

19     reserved by the Muscogee Creek Nation.

20          I asked -- I sent a proposed stipulation

21     to Mr. O'Carroll --

22          THE COURT:  Let me stop you right there.

23          Surely there's going to be a stipulation

24     that Mr. McGirt is a member of an Indian tribe,

25     and that this occurred on an Indian reservation.

1          Tell me that's going to be the case.

2          MS. MCAMIS:  He told me that -- no.

3    Today for the first time, he told me it had to be

4    a quid pro quo, and that I had to give him

5    something before he would stipulate to that.

6          And what I was asking the Court is that

7    the Court would surely take judicial notice.

8    This is a situation where the United States

9    Supreme Court made those findings.

10         THE COURT:  All right.  Let me hear from

11   Mr. O'Carroll.

12         Please, approach the podium.

13         MR. O'CARROLL:  Yes, your Honor.

14         THE COURT:  "Yes" to what question?

15         MR. O'CARROLL:  Say again, sir?

16         THE COURT:  Let me hear from you with

17   regard to the comments made by Ms. McAmis.

18         MR. O'CARROLL:  I think that she

19   accurately stated what I told her.

20         THE COURT:  Okay.  Is there a

21   stipulation that Mr. McGirt is a member of an

22   Indian tribe and that this alleged offense

23   occurred in Indian territory?

24         MR. O'CARROLL:  Are you telling me to

25   stipulate, Judge?

1          THE COURT:  No.  I'm asking you if there

2    is a stipulation.

3          MR. O'CARROLL:  So far, no.

4          THE COURT:  Okay.  Did Mr. McGirt take

5    the position in a previous appeal to the Supreme

6    Court that he was, in fact, a member of an Indian

7    tribe?

8          MR. O'CARROLL:  I'm confident that he

9    did, Judge.

10          THE COURT:  Did he take the position

11    than these alleged crimes occurred on Indian

12    territory?

13          MR. O'CARROLL:  I'm confident he did,

14    Judge.

15          THE COURT:  Very well.  Anything else?

16          MR. O'CARROLL:  No, your Honor.

17          THE COURT:  Okay.  Anything else,

18    Mr. White?

19          MR. WHITE, JUNIOR:  I would just ask for

20    a line-up of witnesses for tomorrow.

21          THE COURT:  Oh, I can't hear you.  Take

22    your mask down a little bit, sir.

23          MR. WHITE, JUNIOR:  I would ask for a

24    line-up of witnesses the government intends to

25    call tomorrow.

1           THE COURT:  Ms. McAmis, are you prepared

2      to do that?

3           MS. MCAMIS:  Your Honor, I -- just to be

4      clear, do I need to formally ask for the Court to

5      take judicial notice because if not, I will need

6      to have a witness come in and testify as to those

7      matters that were found by the Supreme Court.

8           THE COURT:  The Court is prepared to

9      take judicial notice that Mr. McGirt is a member

10     of an Indian tribe and that these alleged acts

11     occurred on Indian territory.

12          Also, the Court would find that

13     Mr. McGirt would be estopped from taking any

14     other position in light of his prior proceedings

15     and prior positions.

16          MS. MCAMIS:  And with that, your Honor,

17     I've provided counsel with the exact order of the

18     witness list and there's only, I believe, four

19     more witnesses on there, so I don't know what

20     else they're asking of me.

21          THE COURT:  Okay.  Very good.

22          MR. WHITE, JUNIOR:  Thank you.

23          MS. MCAMIS:  I have nothing further,

24     your Honor.

25          THE COURT:  Okay.  Anything further,

*UNITED STATES DISTRICT COURT*

1    counsel?

2            MR. WHITE, JUNIOR:  No, your Honor.

3            THE COURT:  Okay.  We'll see you

4    tomorrow morning at 9:00 a.m.

5            (Off the record at 5:25 p.m.)

6            (This concludes proceedings had on

7    November 4, 2020.  For further transcription, see

8    Volume II of this transcription.)

9                    *   *   *   *

10              C E R T I F I C A T E

11

12            I, Shelley Ottwell, Registered

13    Professional Reporter for the Eastern District of

14    Oklahoma, do hereby certify that the foregoing is

15    a true and accurate transcription of my

16    stenographic notes and is a true record of the

17    proceedings held in the above-captioned case.

18            I further certify that I am not employed

19    by nor related to any party to this action, and

20    that I am in no way interested in the outcome of

21    this matter.

22            IN WITNESS WHEREOF, I have hereunto set

23    my hand this 25th day of October, 2021.

24
     s/Shelley Ottwell
25   SHELLEY OTTWELL, RPR, CSR
     United States Court Reporter

*UNITED STATES DISTRICT COURT*