# UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> JIMCY MCGIRT, ) <br> ) <br> Defendant. ) | Case No. 20-0050-JFH <br> Relates to Docket 220 |

## MOTIONS IN LIMINE

**COMES NOW**, the Defendant, by and through his undersigned attorneys, Richard O'Carroll, O'CARROLL & O'CARROLL, and Julia D. Allen, ALLEN LAW OFFICE; pursuant to pursuant to Rule 103 of the Federal Rules of Evidence; the Oklahoma and Federal Constitutions; and submits these Motions in Limine and requests Orders in Limine to prohibit the Government from making any reference to; inference; or eliciting testimony as to the following:

(1) The allegedly "lost tape cassette" of B.C., the complaining witness, disclosing allegations of abuse to her now-deceased aunt, Nenna. The testimony was particularly prejudicial and completely without foundation or reliability. The testimony was as follows:

Q. (BY MR. WHITE, JUNIOR:) Did Nenna tell you she questioned your daughter?
A (BY B.C.'S mother Kuswane) She did…
Q. And did Nenna tell you that she questioned your daughter about sexual abuse allegations concerning Mr. McGirt?
A. She did.
Q. And so this event Nenna turns on a microcassette recorder, which I understand contains the entirety of the conversation between your daughter and Nenna?
A. Yes.

Q. And that happened sometime after you got back from Cancun, Mexico, but before September 12th when Dr. Fangmeier and Stewart examined your daughter, true?
A. I believe so...
Q. (BY MR. WHITE, JUNIOR:) Were you with Nenna when she --
A. We were -- when the deputy met us, he listened to the cassette tape.
Where did the deputy meet you?
A. At -- on County Line in Quick Trip.
Q. And do you remember the name of the deputy that listened to it?
A. I believe it was Scott Moss.
Q. Scott Moss, whose name appears on some Wagoner County documents.
Are you familiar with that? A. Yes.
Q. You talked with Scott Moss?
A. Yes.
Q. And did Scott Moss take the tape?
A. I don't remember.
Q. Were you with Nenna when Scott Moss listened to the tape?
A. I was -- he was listening to it in the car, and Nenna wasn't with him. He was listening to it. TR. 289-290

There's no specific memory by any witnesses and no law enforcement officer to vouch for the fact it had been lost and perhaps more importantly, Defendant is unable to cross-examine the tape recorder of the statement – the deceased aunt Nenna.

The importance of the prejudicial admission of the "lost" cassette is illustrated by use by the Government in closing:

"You know what would be awesome? It would be awesome if we could somehow have found that tape recording that Nina made of Brie. . . But it has been 24 years, and we don't. But that's not Brie's fault, and that does not mean that the defendant is not guilty." Tr.259

To be sure, it is the Government's case to prove and stating it's not "Brie's fault" for the disappearance of the tape would infer the 27 years delay and the resulting lost cassette tape is the fault of Defendant McGirt.

(2)   Any mention or reference of the alleged reaction by Deputy Scott Moss of the Wagoner County Courthouse, an unendorsed witness after hearing the tape recording.

Norma Blackburn, the grandmother of B.C., testified that after Deputy Moss heard the "lost" cassette tape, he went to "throw up" inside QuikTrip after listening to it and then "apologized" for throwing up. Tr.291

Admission would clearly be rank, prejudicial hearsay denying Defendant the right to cross-examine the authorities that allegedly lost the cassette as to its contents and the circumstances surrounding its disappearance. See Rule 801 (c) Hearsay. "Hearsay" means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.

(3)   Allegedly "stolen" letter

There is much made of an allegedly "stolen" letter that contains a confession from the Defendant that "Devil made me do it." No other context or specifics are provided by the Government's witnesses and now the letter is missing, and the Government alleges it was "stolen."

(4)   Hypothetical questions and leading questions to lay witnesses regarding the alleged "lost" cassette and "stolen" letter as well as what they would have done differently:

A question by the Government to De Ette Kuswane, mother of B.C.:

"Q. If you had known in the year 2000 that you might need the letter in 2020, would you have done something different --

3

A (by Kuswane) Yes.
Q. -- with the letter?" Tr. 226

"Q (by Plaintiff): If in 1996 you knew that in 2020 you would be in this room being asked about that cassette tape, would you have made a hundred copies of it?"
A (by Blackburn) Of course, I would have." Tr. 295

"Q (by Plaintiff). If you had known in 2020 that you would be sitting here in a court of law being asked about it would you have made a hundred copies of that letter?
A. Yes."
Tr. 297

"Q (by Plaintiff). Counsel asked you if you had a cell phone. You didn't at the time. He asked you if you had a camera. If you had thought of that, would you have done whatever you needed to do to make sure you had that letter here in 2020?
A. Yes.
Q. Does the fact that that letter is not here in 2020 mean that letter didn't exist?
A. No."
Tr. 297

"Q. Does the fact that that letter is not here in 2020 mean in any way, shape, or form that your daughter wasn't victimized?
A (by Kuswane) No."
Tr. 298

"Q. As we sit here today, does it matter to you whether she waited three days or two weeks to tell you?
A. No.
Q. If she waited three days to tell you or if she waited two weeks to tell you, does that in any way, shape, or form mean she wasn't victimized?
A. No." Tr. 299

"Q. And so when you look back on it and counsel asked you, Why did you call your mom first instead of the police? I mean, if you had it all to do over again might you have handled it differently?
A. Yes.
Q. Does that in any way, shape, or form mean that your daughter wasn't victimized?
A. No." Tr. 302

4

This invades the province of the jury as to the weight to give to the evidence and the credibility of the witness. Again, the admission of this leading testimony lacks any reliability and shifts the burden of proof – and blame – to Defendant for the delay of 27 years and the missing evidence. It also invades the province of the jury as to the presupposition of guilt.

(5) Terry Staber's actions on camera putting something in Norma Blackburn's gas tank but doesn't have the videotape.

Norma Blackburn, grandmother of B.C., testified, without foundation, that defense witness Terry Saber, Blackburn's son, "stole" the confession letter from Blackburn:

A. He [Terry Saber], got me out of the house by saying that the heater wasn't working. Took me over to my friend's house. He was going to work on it. ***He also put some stuff in my gas tank in my car.***
Q. How do you know this?
A. Because we had him on camera doing that." Tr. 369

However, despite extensive investigation by the FBI, no such videotape has been revealed in discovery. Indeed, Blackburn testified that the videotape condemning Defendant's witness is in the custody of "her daughters", mother and aunt of B.C.

"Q (by Plaintiff). You have him on camera?
A (by Blackburn) On doing that one, putting stuff in my gas tank.
Q. Where is the -- where is the camera? Where is the video footage?
A. It's the house on the outside.
Q. Okay. But where is the video of him putting stuff in your gas tank?
A. I've got it, but I don't know where it's at right now.
Q. Okay.
A. One of my daughter's has got it." Tr. 370

Again, another missing highly prejudicial piece of evidence that gratuitously impugns the character of Defendant's witness. This witness was called solely for the proposition that he did not "steal" the alleged confessional letter from Defendant.

(6) Any testimony from witnesses that quantify the guilt of the accused. By way of example, Plaintiff elicited this improper testimony in a highly leading and prejudicial question to Dr. Stewart, the physician that examined B.C. in 1996:

"Q (by the Government) And with respect to Dr. Kellogg, of those over 2,000 sexual abuse examinations can you tell us whether 96 percent of those were normal with no findings?
A (by Dr. Stewart) I think that's correct." Tr. 44

This testimony is bolstering and effectively asserts to the jury that there is a 96% chance that Defendant guilty.

(7) Testimony regarding "grooming" by Defendant or name-calling by the Government of Defendant

"Q (by Government). Can you tell us, Dr. Stewart, whether or not it is common for sexual predators of children to jack-push their finger inside or do they groom their children?
A. Well, I understand that it's more common to groom them.
Q. Is it common for sexual predators to put just the tip or just touch or just rub?
A. I think that's fairly common." Tr. 91

There is no foundation or evidence for this highly prejudicial statement. The Plaintiff has previously stated in its support for its arguments to admit 404(b) evidence that Defendant selected Norma Blackburn as a partner while in prison to date because she had a small child in her dysfunctional household. By Plaintiff's

own evidence, this is patently false as Defendant and Blackburn were married when Kuswane became pregnant with B.C.

(8) Use of the word "victim" by the Government;

(9) References or inferences that no forensic interview exists in this case because B.C. is from a small community; that it wasn't B.C.'s "fault" that there is no forensic interview; or that the "system" was complicated;

"Q. (BY MS. MCAMIS:) Doctor, is there any difference that you have seen in your practice about children who come from a larger community versus children who come from a smaller community?
A (Dr. Stewart) There are differences, yes.
Q. If, in fact, the child is not taken for a forensic interview, is that her fault? Is that her choice?
A. I don't know. There are a lot of factors that come into play in terms of the work of the DHS investigators, the local law enforcement. It's a bewildering and complicated system." Tr. 96-97

This testimony is highly prejudicial and engenders sympathy. To be sure, the burden of proof doesn't change because the complaining witness is from a small town. Again, assigning no "fault" to B.C. for the failure to conduct a forensic interview attempts to modify the burden of proof required of the Government.

(10) Photos of B.C. on her 4th birthday, recently provided in discovery, depicting text message from B.C. presumably to the Government that assert "this is when it happened"

"Q (by Plaintiff). Now, do you remember your fourth birthday as you sit here today?
A (by B.C.) No.
Q. Do you remember whether you had any -- did you have a party?
A. I can't remember." Tr. 139

Q. Do you recall who you were with on your birthday?

7

A. No.
Q. Do you recall over this week period of time staying with your father?
A. No.
Q. If Norma testifies that you stayed with your father over this week period of time your mother was gone, would you dispute her?
Q. (BY MR. WHITE, JUNIOR:) Sure. Specifically, if when Norma testifies if she testifies that on Tuesday, August 13th, the day that you turned four, you stayed overnight with your dad.
Would you dispute your grandmother, Norma, when she tells the ladies and gentlemen of the jury that?
A. I cannot remember. TR. 142

B.C. testified she has no memory of her 4th birthday, and the photo has no probative value but only prejudicially inflaming the jury to see a small child in a birthday outfit. It has "no tendency to make a fact more or less probable than it would be without the evidence; and the fact is of no consequence in determining the action (see F.R.E.. 401, 402, 403)

(11)     Expert conclusions by lay witnesses that B.C.'s alleged changes in behavior were the result of – or consequence – of child sexual abuse.

"Q. Okay. During that -- after that time period when De Ette got back from her trip and took Brie back home with her, was there anything else that caused you, at the time now looking back on it, concern?
A (by Blackburn) Hindsight is 20/20. I just thought it was cause her mother and her was so close. I thought she was missing her.
Q. And now, just yes or no, based on what you know do you think that there was a different reason for that?
A. It's a different reason for that." Tr. 317

"Q. You didn't want your daughter to be all torn up; did you?
A (by Kuswane) No.
Q. Even though there were no physical signs of sexual abuse that day, has she suffered the consequences of sexual abuse ever since?
A. Yes." Tr. 301

Although all witnesses, including B.C., have scant memory of the events at issue, there is a consistent theme that all problems are a result of unproved, uncorroborated sexual abuse allegations:

"Q. Can you tell us -- have you been able to see and feel these things ever since that happened to you?
A (by B.C.) Yes.
Q. How has that affected you during your life? A. I don't have a lot trust in people.
Q. You don't have a lot trust in people.
How else has it affected you?
A. I had anger and depression, that's all I can think of right now.
Q. Do you suffer from anxiety?
A. Yes.
Q. And have you been able to work during this time period?
A. Not really.
Q. Why not?
A. It's just really hard sometimes to have to think about stuff and to try to think about it again.' Tr. 128-129

This testimony has no foundation and is outside the testimony allowed by lay witnesses. (See F.R.E. 702)

(12)   Testimony of "no physical trauma" is "normal" or expected from child sexual abuse.

Dr. Baxter testified that its "Can't rule it [child sexual abuse] in, can't rule it [child sexual abuse] out" by Dr. Stewart. This testimony is not probative of a fact at issue.

(13)   Leading Questions generally by AUSA McAmis: The above examples and the transcript are replete with leading questions by AUSA McAmis. In fact, this Court reprimanded AUSA McAmis in the earlier trial

"THE COURT: Counsel, can you please ask a non-leading question?
MS. MCAMIS: Yes, I apologize." Tr. 322

WHEREFORE, premises considered, Defendant requests that Orders in Limine be issued for the above topics and such other and further relief as the Court deems just and equitable.

Respectfully Submitted,

/s/ Julia D. Allen

_____

Julia D. Allen, OBA#16305
ALLEN LAW OFFICE
P.O. Box 995
Ketchum, Oklahoma 74349
(918) 671-5775
juliadallen@yahoo.com, and


Richard O'Carroll OBA # 11947
O'Carroll & O'Carroll
2171 N. Vancouver
Tulsa, OK 74127
(918) 584-4192
troc@cox.net


CERTIFICATE OF SERVICE

This is to certify that on the 10th day of October 2023, a true and correct copy of the above and foregoing document was sent electronically to:

Sarah McAmis, Assistant United States Attorney
Kendra Jenner, Assistant United States Attorney

/s/Julia D. Allen
_____
JULIA D. ALLEN